## Wright *against* Guier.

An action of trover and conversion will lie by the owner of the legal title to land, to recover the value of wood cut upon it by a trespasser: and he who purchased the land at a sheriff's sale as the property of one who had trespassed upon it by cutting timber, and in pursuance of his purchase continued to cut timber from it also, at the same time owning and occupying adjoining lands, included in the same deed from the sheriff, has not such a colourable title or possession as will protect him from this form of action.

Constructive possession of unoccupied land is sufficient to support trover for the asportation and conversion of trees felled thereon by a trespasser.

There is no difference, as regards occupancy, between a solitary trespass and repeated trespasses; and the occupancy of a trespasser who does not cultivate and enclose, continues no longer than he remains in contact with the soil.

ERROR to the common pleas of *Dauphin* county.

This was an action of trover and conversion brought by Sarah Ann Guier, administratrix of Adam Guier, deceased, against Franklin Wright. and Henry M. Bayard, for a large quantity of cord wood cut upon the land of the plaintiff's intestate.

The legal title to the land was clearly in the plaintiff, and it was situate near to the "Victoria Iron Works" of the defendants, and adjoining their lands.

The question of law raised in the case was, whether the defendants had not such a colourable title to and possession of the land, as protected them from a recovery in this form of action. Their evidence on that subject was as follows:

The defendants then called William Clark, Jun., a witness, who being duly sworn said, I believe Cardon started Victoria Iron Works in the year 1829; I went to live at the works in January 1831; I know the tract of land in question, Halberstadt. or Cooper tract; Cardon told me this tract of land belonged to him. We had wood cut on it, and made coal and used the coal, made rails on it. We had a great deal of chestnut oak bark taken from it and hauled to the tannery by Cardon's hands and teams; he sold the bark. Timber was taken from it for building purposes; had shingles made on it. They were cutting on this land at the time I went there, Mr. Cardon's hands, that continued until the spring of 1833, when I left there.

On cross examination by plaintiff's counsel, this witness further said:

No improvement on this tract; there had been a house, none standing at this time; do not know who built it; it had fallen down before Cardon came there; do not know of any person beside Cardon cutting timber on this tract. Cardon never told me how he

claimed this property; the north line of the tract is within a quarter of a mile of the furnace; I knew pretty near where the north line ran; I think there was an improvement on the George Cooper tract; I employed hands for Cardon to cut wood on this land; Cardon was in possession of Victoria Iron Works in May and June 1832; he was then cutting off bark from this land.

The defendants then gave in evidence the record of a judgment in the common pleas of Dauphin county to August term 1832, No. 75. The President Directors and Company of the Bank of Pennsylvania *v.* Alexander Cardon. May 18, 1832, Judgment for 22,750 dollars, real debt 11,375 dollars. Also, a *fieri facias* on the above judgment to November Term 1833, No. 47, with the following levy and return, indorsed, viz.

" Levied on two certain forges and one furnace, called Victoria Iron Works, and about 1600 acres of land attached thereto, situate in Rush township, Dauphin county, bounded by lands of the heirs of Joseph Weim on the west, Peter's Mountain on the north, lands now or late of George Shiley's heirs on the east, and lands of the Dauphin and Susquehanna Coal Company on the south, on which is erected, in addition to the forges and furnace, a convenient frame house, &c. &c."

Also, *venditioni exponas* to January Term 1834, No. 15, returned:—" Real estate sold for 12,202 dollars 73 cents, after deducting costs. J. Fox, Sheriff."

Also, deed from John Fox, Esq., sheriff of Dauphin county, to Henry M. Bayard, for Victoria Iron Works and 1600 acres of land, bounded and described as in the levy-deed dated January 28, 1834, and recorded.

Also, deed from Henry M. Bayard to Franklin Wright for one moiety of Victoria Iron Works and lands thereto belonging, dated October 17, 1835, and recorded.

Defendants then called William Clark, Jun. again, who, upon being shown the above mentioned deed from Sheriff Fox to Henry M. Bayard, said, this land in question is included in the boundaries described in that deed.

The court below (Blythe, president) thus instructed the jury:

" It appears that Cardon cut wood on this land two or three years; that defendants purchased Cardon's interest in Victoria Iron Works, with the lands belonging thereto; that, agreeably to the testimony of William Clark, Jun., the description in the levy under which Cardon's property was sold, would include this land; that the defendants cut wood on this land after they bought, one season. It appears to me that defendants have not shown such a possession of the land as would make them liable to an action of ejectment, and that the objection is not valid. If you find for the plaintiff, you will assess the value of the wood converted to their own use by defendants, fixing the value at what it was practically worth at the place where it was converted. You will not allow any thing

for the trespass in cutting the timber, that is waived by bringing the action in this form."

*Foster*, for plaintiff in error, cited 3 *Binn.* 54; 3 *Serg. & Rawle* 509; 6 *Serg. & Rawle* 476; 10 *Serg. & Rawle* 114.

*Johnston*, for defendant in error, cited 2 *Rawle* 392. 415; 1 *Watts* 533; *Bull. N. P.* 32, *notes*; *Cro. Car.* 242; 2 *Sel. N. P.* 517; 7 *Term Rep.* 11. 15; 1 *Hall's Jour. Juris.* 256; 2 *Watts* 23.

The opinion of the Court was delivered by

Gibson, C. J.—Though trover is said not to be a proper action to try title to land, it is certain that it may be supported for the price of what was a part of the freehold, converted after severance from it, if the wrong-doer were not in the actual and exclusive possession. Such appears from Player *v.* Roberts, 1 *Jones* 243, to be the law of the English courts, and if we regard no more than the naked point determined by our own, we shall see that our decisions, though full of jarring dicta, entirely agree with it. In Mather *v.* Trinity Church, which was the first of them, it was ruled that trover for stone and gravel dug from a quarry, lies not by one who has the right of possession, against one who had the actual possession. Next in Baker *v.* Howel, it was ruled that assumpsit for money had, lies not for the price of sand sold from a bar of which the defendant was found to be in possession. Finally in Brown *v.* Caldwell, the same principle was asserted in respect to replevin for slates quarried by a party who was an occupant. So far both decision and dicta agree, and it is therefore to be taken for settled, that such an action lies not *against* a party who was *in* actual possession at the time of the severance. But no court has adjudged, nor can it be maintained on principle, that it lies not *for* a party *out* of such possession against a casual trespasser. Such a decision would disaffirm the well founded principle, that legal seisin carries the possession with it wherever there is no adverse possession to displace it; and as there is no adverse possession of trees without possession of the land on which they grow, the property and possession of them as chattels, at the moment of their severance by a casual trespasser, are united in the owner of the inheritance. Trover is not so exclusively founded on possession as trespass; and if, as is universally conceded, a constructive possession of unoccupied land, is sufficient to support the latter for the felling of a tree, why may it not support trover for the asportation and conversion of it? The difference between the actual and constructive possession of a plaintiff, consists not in an effect peculiar to either, but in the nature of the evidence necessary to establish it. The former is susceptible of proof by oral testimony, while the title must be produced to establish the latter; and hence a supposed locality of any action

[Wright v. Guier.]

depending on it; a ground of objection not open to the party in this instance, as the action is in the county where the land lies.   Of the incongruity of making trover a local action, and of the consequential inference that, being essentially transitory, it must be sustained, if at all, indifferently in the county and elsewhere, I shall speak when I shall have spoken of the defendant's claim to have been in the actual possession.   At present I admit, that if the action might not have been as well brought out of the county as within it, it can not be maintained.

Why should the defendants' undisputed possession of their own land be extended to the *locus in quo?*   Even colourable title to it they had not.   The Victoria works were started in 1829, and notwithstanding the absence of pretext for claim, this tract was used as woodland, from the first, as if it was a part of the domain. Wood was cut on it for coals and for rails, by direction of the manager, who also disposed of bark from it at a neighbouring tannery; subsequently to which, the estate was seized in execution, and sold to the defendants, by boundaries which include the tract in question; and having thus received it, they cut the wood in question.   A house that once stood on it had fallen down; and there was no clearing on it or enclosure whatever.   Besides, during all the time mentioned, the plaintiff's intestate had paid the taxes.   Such are the few and simple elements of what has been called a case of actual possession.   Hapily we have a standard for the measurement of it.   "When I speak of possession," said Mr. Justice Duncan in Brown *v.* Caldwell, "I mean an actual occupation; not a bare, solitary, trespass by an intruder, but an actual, visible, notorious occupancy."   But is there a difference, as regards occupancy, between a solitary trespass and repeated trespasses?   None has been taken in any book of authority, and none can be taking in reason.   There could be no action of trespass with a *continuando,* if an ouster is necessarily constituted by indefinite repetitions of the injury.   For this reason it is, that the ouster in the declaration in ejectment, was not laid with a *continuando;* in consequence of which, it was thought, that *mesne* profits could not be recovered in that action; for, proceeding on the ground of an ouster, the plaintiff, though he recovered damages for the circumstances immediately attendant on it, could not maintain trespass for any injury subsequent to it, till he had regained the possession by the retroactive operation of an entry by process or otherwise.   If repetition of a trespass alone, then, does not necessarily constitute an ouster, with what sort of occupancy must it be attended to have that effect?   In Johnston *v.* Irwin, 3 *Serg. & Rawle* 291, it was ruled that though residence is not a necessary ingredient of adverse possession, there must be enclosure and cultivation.   This was indeed predicated of possession to raise the bar of the statute of limitations; but why should there not be the same degree of possession, to bar an action for the produce of the soil, that is necessary to bar an action for the

soil itself? Such an occupancy is indefinitely continuous, while the occupancy of a trespasser, who neither cultivates nor encloses, continues no longer than he remains in contact with the soil. But it is supposed that a resident on adjoining land, is in actual possession of all he uses for his ordinary purposes, according to its kind, as a part of his domain; and in this lies the vice of the argument. Where a particular tract of land is occupied by a resident on it, under a colourable title, his possession of it is co-extensive with the lines of the survey; but it is not admitted that he gains possession of his neighbour's unoccupied tract by crossing the intermediate boundary to trespass on it. "It is evident," said Mr. Justice Yeates, in Gray *v.* M'Creary, 4 *Yates* 496, "that, in a question of boundaries, evidence of possession does not apply with the same degree of force as when the whole of a tract is held adversely against the claimant." The entire course of the decisions, has been to restrain possession without at least colourable title, as strictly to enclosures in this country, as it has been in England, and the English principle certainly is, that constructive possession is not to be admitted in the case of an intruder; as an exception to which, nothing gave rise to the notion that it was not universally applicable to lands in Pennsylvania, but our customary law of acquiring title to the lands of the state by settlement, which suggested to those who had entered on appropriated land, the notion of claiming by the statute of limitations, as much as they could have held by an improvement. Such a claim, however, has been constantly disallowed; and there never has been conceded to the possession of a trespasser, in the guise of a settler on appropriated land, without warrant or location, a single incident or feature of an improvement. Now, what difference, as to constructive possession, is there betwixt a settler seated on the tract itself, and one who, seated on an adjoining tract, cuts his rails and firewood on his neighbour's land as if it were his own. Certainly there is none in favour of the latter, coming in as he does with no design to hold the land by his entry, and taking no subsequent step to acquire it as a settler. If a settler on appropriated land, shall not be deemed in constructive possession of woodland used by him as such, why shall a non-resident? But even constructive possession would ill serve the purpose of defence in an action like the present; for when an intruder is not in actual occupation, the constructive possession is in him who has the right—which, it will be seen, is sufficient to support the action. I grant that such a trespass may be a disseisin to support an ejectment at the election of the disseisee, but it certainly would not constitute a disseisin of him against his will. The books are full of cases illustrative of the distinction. Nor would the trespasser acquire a possession within the protection of the statutes of forcible entry and detainer. Why, then, shall he not answer in trover for the conversion of trees turned into chattels by his trespass? "The owner of a tract of land in Clearfield county," said Mr. Justice Duncan in

[Wright v. Guier.]

Brown *v.* Caldwell, " whose timber has been taken by a trespasser and sawed into boards, follows it to Lancaster county and replevies it in the streets of the city; the doctrine of venues shows that this can not be done." In Player *v.* Roberts, however, the same thing in principle was actually done. " If," as he had said in the same breath, "*incidentally* title in such action may be called in question," why may it not be done in all cases of the sort without regard to the locality; or how can it be called in question in an action of trover otherwise than incidentally? He evidently thought, that it comes into question directly, where it is the foundation of the possession; and incidentally only, when it is the consideration of a contract, which may be sued upon any where, because contracts have no locality. But neither has conversion locality; and title to land may be as much involved in the one as in the other. Nor does it follow that a dispute about the possession depends, in all cases, on the title; the right to the one, and to the other, are different things. Title in an action like the present, by which compensation for a trespass is demanded, and not the land, is not the plaintiff's case; nor is it directly put in issue by the pleadings: it is questioned incidentally, if at all, like any other fact introduced by the evidence. It was, in truth, not questioned at all in the instance before us. It is not perceived, therefore, that the doctrine of venues furnishes an objection to a personal action. If it did, it would expose the wild lands, not only in Clearfield county, but in every other on the Allegheny and the branches of the Susquehannah, to pillage, for which there would be no redress. Trespassers on these, are seldom found in the county to answer an action, nor are they often of sufficient ability to respond in damages; by reason of which, the only efficient remedy of the owner, is pursuit of the property. A temporary saw-mill is put up on the first convenient stream, without regard to tract or survey; and if this is such a possession of the contiguous tracts from which timber is taken in the course of the sawyer's business, as to prevent the owners from following it in specie, or if they are prevented from doing so, independently of the question of possession, by a supposed locality of the injury, they are left without a practical remedy. Is not the sawyer's case, in principle, that of an iron-master, who, once in fifteen years, uses an adjacent tract of unseated land to strip it of its timber, while he leaves every other act of ownership, such as payment of taxes, to be performed by the rightful owner. The wood is usually coaled on the land; and hence there is said to be at least a temporary possession during the process. But the same may be said of a shingle-taker's occupancy of his shed, while he works up the product of his trespass.

The true reason why trover or replevin lies not against an actual occupant, is not any supposed locality of the question, but the impolicy of suffering him to be harassed with a separate action for each bushel of wheat consumed, or stick of firewood burnt, on the

premises, instead of having the matter settled at once by an action to recover the possession. Chief Justice Tilghman glanced at it in Mather *v.* Trinity Church, where he said the owner might first recover the possession by ejectment, and then recover the mesne profits by an action of trespass. There is substance in a reason like that; but there is only form in an objection on the doctrine of venue, whose general inconvenience is manifest in the efforts of the profession to get away from it. Though all personal actions were transitory at the common law, because, as it was said in Bulwer's case, 7 *Rep.* 61, *debitum et contractus sunt nullius loci,* yet to the intent that debt, account, and all such actions, should be brought in the county where the contract was made, it was enacted by the 6 Rich. 2, c. 2, that if it appeared by the declaration that the action was not brought in the county in which the contract was made, the writ should abate; in the interpretation of which it was held that if the discrepance appeared entirely by the record, it would be error—an interpretation which precluded an advantage from a discrepance between the declaration and the evidence at the trial. And the inconvenience of the statute is still further visible in the fiction employed to elude it in an action on a foreign bill, bond, or note, which must be described as having been made at the place where it bears date; in regard to which, the practice has been to state the place truly, and then to aver that it is in the county in which the action is brought, as, for instance, "at Calcutta, in the East Indies, to wit, at London, in the ward of Cheap." Much as I dislike fiction in these matters, I would, were it necessary, consent to support an averment that Clearfield county, or any other place, is in the streets of Lancaster, rather than suffer an injury to pass without a remedy. In the leading case of Fabrigas *v.* Mostyn, *Cowp.* 176, Lord Mansfield said: "There is a *substantial* and a *formal* distinction as to the locality of trials. The substantial distinction with regard to matters arising within the realm, is where the proceeding is *in rem,* and where the effect of the judgment could not be had if it were laid in a wrong place, as in the case of *ejectments,* where possession is to be delivered by the sheriff of the county; and as the officers are county officers, the judgment could not have effect if the action were not laid in the proper county. The formal distinction arises from the mode of trial; for trials in England being by jury, and the kingdom being divided into counties, and each county being considered as a separate district or principality, it is absolutely necessary that there should be *some* county where the action is brought in particular, that there may be process to the sheriff of that county to bring a jury from thence to try it." After this, is it not too late to insist on the old distinctions by which every thing that savoured of the land was local; as debt for rent when not founded on the contract; debt against the executor of a tenant for life; debt by an executor for the arrears of a rent charge; debt in the debet and detinet against the executor or administrator

[Wright v. Guier.]

of the lessee: and a thousand other instances mentioned in Bulwer's case.   An objection on the ground of locality is purely technical, and not to be favoured; for there is nothing inherently local in the trial of title to land; and if there were, an objection on the foot of it would prevail, in all cases, whether it were incidentally drawn into contest or not.   The muniments of it may be produced everywhere with equal facility; and the witnesses to the facts involved in it, as often reside out of the county as within it.   The jurors of one county, too, are just as competent in respect of moral and mental qualifications as those of another.   But though popular prejudice against a party or a title sometimes makes its locality a grievance, I admit that where the land itself is demanded, the action must be brought in the county, and the same thing may perhaps be said of trespass, in which the issue is, or may be, formally joined on the title.   In the case before us, the issue was not on the title; and that it was introduced into the case by the evidence, shows that it was only incidentally involved.  But the doctrine of locality has been urged for the sake of an argument deduced from its general consequences.   No objection was made on that ground in Player *v.* Roberts; and we are to conclude that it was thought to be untenable.   In the case before us, possession from title having been shown, without adverse possession to rebut it, the plaintiff was entitled to recover.

Judgment affirmed.