## Baring *against* Peirce.

In an action of trespass *quare clausum fregit*, the defendant cannot justify, by proof of a parol authority derived from an agent of the plaintiff, unless he can also show that the power of the agent extended to the granting of such authority. One who contracts with an agent, must look to his power.

An agent constituted for the purpose of procuring the settlement and sale of lands, and who by his written authority is specially instructed to enter into written contracts for that purpose, has no power to enter into any parol agreement for the sale or settlement of the lands: and such parol agreement will furnish no defence to an action of trespass *quare clausum fregit* by the owner of the land.

WRIT of error to the Common Pleas of *Tioga* county.

Alexander Baring and others, trustees of the estate of William Bingham, against Cromwell Peirce and others. This was an action of trespass *quare clausum fregit* for entering upon the land of the plaintiffs and cutting and carrying away timber. The defendants pleaded not guilty and *liberum tenementum:* to which the plaintiffs made a novel assignment describing the *locus in quo.* That the original title to the land was in the plaintiffs, and the timber was cut by the defendants upon it, were not subjects of dispute; but the defendants predicated their defence upon an alleged parol agreement made with Samuel M'Dougal, for the settlement and purchase of the land; and to support this ground, gave in evidence the following letter of attorney from R. H. Rose, a duly authorized agent of the plaintiffs, to Samuel M'Dougal, dated 26th February 1831 :—

"Sir:—In committing to you the charge of surveying lots for settlers on the lands of the late William Bingham's estate in Tioga county, you will please observe the following instructions:—Be as careful as possible in making your surveys in such a manner as to leave the ground in the vicinity of the lot surveyed as suitable as possible for other settlements; and always to run your line with a reference and regard to the capability of the adjoining land for a settlement. Note in some portable book, which you should always have with you, the application of each person for a lot, and endeavour by all means to avoid any charge of favour or partiality to any one, which settlers are very apt to make against a surveyor. Be careful in noting any errors in former surveys which may be discovered, and correct them, when found, upon your map. The stealing of timber must be checked in every possible way. Examine every place where you think this is done, and prosecute the persons guilty of this shameful practice.

"The price of the farming land in all of the townships, except Charleston, is $2.50 per acre; one-eighth part to be paid at the

[Baring v. Peirce.]

end of three years, and one-eighth part annually afterwards: interest to commence at the time of the first instalment.   When a person has commenced his improvements before the survey, he is to be charged from the commencement.   In other cases, the commencement of the term should be from the date of the settler's application.   There are some lots which will be purchased solely for the timber on them; the terms for these should be different. - The soil of these lands is generally very poor, and of little value after the timber shall be taken off.   They may be rated at two dollars per acre; with interest from the date, payable in four equal annual instalments.   And if you doubt the capability of the applicant to pay the amount, you may demand security for one or more instalments.

" I apprehend, that in consequence of the frequent changes which have been made in the occupants of the lots, and the many alterations of the lines which they have had among themselves, there are many surveys marked on the map different from the lines of the lots as they now are.   Whenever, in the course of your surveys it may be in your power to correct any errors, be careful to do it, so as to have your map as correct as possible.   Report annually to the commissioners' office the state of the land, so as to have all the lots which shall be occupied by settlers, or for which they are taxed, taken from the tax list of Mr Bingham's estate. For your surveys of settlers' lots, you shall be allowed to receive from each person four dollars for the survey; if the lot be 50 acres and upwards, the settler shall be entitled to have that sum allowed to him at the time of his making his payments to the estate for the land; but if the lot be less than 50 acres, the survey is to be at his own expense.   It will be your duty, without further charge, to furnish the agent of the estate with a map of the lots surveyed, and at the time of the survey, to fill up and sign with the purchaser separate articles of agreement for the lot, printed blanks of which will be furnished to you.   Of these, send one to the agent of the estate with the lot marked on the back of it, give one to the purchaser, and retain the other.   Have your own chain-bearers, and the purchaser will himself mark the lines.   You shall be entitled to one-half of all which you shall recover from the plunderers of timber after the costs of prosecution are deducted."

The defendants then offered to prove by Samuel M'Dougal, that under the authority he received from Robert H. Rose, general agent of Bingham's estate, he made the survey of land on which the defendants reside, and for the defendants; and that at that time the defendants made application to said M'Dougal, as aforesaid, as sub-agent, for a survey and article of agreement for the land described in the plaintiffs' declaration, called by the witnesses the " swamp tract," and that M'Dougal promised the defendant that he should have the lot, and that he would survey the same

[Baring v. Peirce.]

to him and give him an article therefor at some convenient time; but that he could not then do it, in consequence of the water in the swamp, and at the same time told defendant that it would make no difference; that he might go and take possession of the lot, and use it the same as he did his other land.

.The plaintiffs objected to this evidence, but the court admitted it, and sealed a bill of exceptions.

The court, giving effect to this evidence, put the cause to the jury upon the fact, whether the constructive possession of the plaintiffs, which was essential to the right of action, was not devested by the agreement between the sub-agent of the plaintiffs and the defendants. The jury found for the defendants.

*Williston*, for plaintiff in error, argued, that the evidence was not admissible under the general issue, but that a license must be specially pleaded; and cited 5 *Bac. Ab.* title " *Trespass*," p. 218; 15 *Wend.* 338; 2 *Johns.* 321; 10 *Serg. & Rawle* 357. But the sub-agent had no power to make parol agreements for the sale of land, much less to give a license to cut timber; and clearly, the plaintiffs were not devested either of their title, or constructive possession of the land. 9 *Johns.* 35, 376, 331, 361; 7 *Johns.* 1; 9 *Watts* 172; 10 *Watts* 141.

*Maynard*, contra. The objection to the evidence, that license was not pleaded, was not made in the court below, and should not, therefore, avail here. The authority to the sub-agent contemplates the parol application for land, and directs him " to book" such applications, thereby recognising the right of settlers to take possession of the land, and make improvements, and he is to be " charged from the commencement." Here, the alleged acts of trespass were committed in pursuance of an application, which was recognised by the sub-agent, and the execution of the agreement was postponed by him on account of the accidental circumstance that the land was too wet to survey at the time. The defendant was a purchaser of an adjoining tract of land, and this was purchased as wood-land, and intended as such for the use of his farm.

The opinion of the Court was delivered by

SERGEANT, J.—The defendants having no deed or writing for the land in dispute, seek to take it out of the purview of the Act against frauds and perjuries, by alleging a parol contract with the plaintiffs' agent, M'Dougal, and the part performance of it by the delivery and taking possession of the land in pursuance of such contract. To this, the plaintiffs object the want of authority in M'Dougal to make such a parol contract, and this raises the first question in the case, whether any such authority existed. No other authority to M'Dougal is produced, than what is contained

[Baring v. Peirce.]

in the letter of Dr Rose to him dated the 26th February 1831, and this, we think, does not contain such an authority. The power given to M'Dougal by Dr Rose, when he thus employed him as surveyor and agent, is to survey for applicants, and he is expressly directed " at the time of the survey, to fill up and sign with the purchaser separate articles of agreement for the lot, printed blanks of which will be furnished you. Of these, send one to the agent of the estate, with the lot marked on the back of it, give one to the purchaser, and retain the other." These directions are precise and positive—marking out a particular plan which was to be pursued in making these sales, intended to prevent doubt, mistake or litigation, and to ascertain the rights and obligations of the parties by instruments of writing and printing, of which each person interested should be in possession of a counterpart, giving a clear equitable title to the purchaser. But it does not authorize a parol contract or promise at some future day to give to any person a preference of a lot, or a license by which he may enter on the land and cut timber at his pleasure, without conforming to the mode presented by Dr Rose. All the prudential care taken to have the estates disposed of in a methodical and regular manner, by survey and articles of agreement in triplicate, might be entirely defeated, if the sub-agent could thus bind the principal by conversation or parol promise, or other loose and irregular modes of every kind that can be thought of, resting on the dubious and frail evidence of parol, and involving, almost necessarily, dispute and controversy, in opposition to the plainly expressed regulations established by the owners, and known to the applicants. For this being a special authority to M'Dougal, must be strictly complied with: he who dealt with him as sub-agent, was bound to look to his powers as such, in relation to the property of his principal. Nor can it be imagined that Dr Rose intended to vest a power, which might lead to the waste and injury of the property, by despoiling it of its timber, under loose conversations, in which neither the price, nor the extent, nor terms were fixed in the authentic mode he prescribed, nothing definite ascertained or determined, and where the party would be afterwards bound, or not bound, as might suit his convenience or caprice. The whole tenor of the letter contemplates something fixed and ascertained on all these subjects: and one who chose to rely on anything short of what is prescribed, must be considered in a court of law or equity, as doing so at his own risk, and as resting on the good will and favour of the owner, but not as acquiring a title binding on the owner, or one which a court of law or equity can recognise. The other parts of the letter referred to, do not seem in the least to vary this view of its terms, or to be inconsistent with what has been quoted. The direction to book the name of the applicant, (and no such booking has even been produced), was given, as it is expressed in the letter, in order to prevent a charge of partiality, by showing at any

[Baring v. Peirce.]

time afterwards, the time when, and the lot for which such person applied: but does not itself give any legal or equitable claim, where it is not followed up by survey and articles. And as to the direction when improvements had been already commenced, that is only for the ascertainment of the time when interest was to commence, in case a survey and articles were afterwards had. But no right could be acquired by an intruder, who entered and cut down timber, or even improved, as against the owner, where it was never accompanied and followed by survey and articles.

There then being no authorized contract, even possession under it would be unavailing to constitute part performance. But there was not a possession here, in a legal point of view, such as would devest the plaintiff's original constructive possession, and defeat his action of trespass *quare clausum fregit.* There is no evidence that the defendants had resided or built on the land, or cultivated or fenced it in, or had any *pedis possessio,* or paid the taxes: they had no other occupancy than while they were there cutting off timber: and this would not constitute a possession, though they owned the adjacent tract, and claimed this swamp or a part of it, and used this woodland. There must be something else to constitute possession, as was held by this court in *Wright* v. *Guier,* (9 *Watts* 172), where the doctrine is fully examined by Chief Justice GIBSON. There, an iron-master bought a tract of woodland at sheriff's sale, with other adjacent tracts, and entered from time to time to cut and coal the wood, using it as he did his other woods, claiming it under his sheriff's deed; yet this was held not to be such a possession as would give title under the statute of limitations. Now what acts, if proved, make out a contract sufficient to take the case out of the statute of frauds, and pass a title by parol, and what acts constitute a possession such as defeats the action of trespass, are questions of law for the court, in the application of the principles of equity in each case, and it is error to throw these questions on the jury for their determination.

We are, therefore, of opinion, the court below erred in admitting the evidence contained in the bill of exceptions, and also in their charge to the jury on the matters above stated.

Judgment reversed, and a *venire de novo* awarded.