IN THE

# SUPREME COURT OF JUDICATURE

OF THE

# STATE OF NEW JERSEY.

## AT JUNE TERM, 1855.

~~~~~~~~

## GEORGE CORNELIUS and CHRISTIAN D. EMPSON *vs.* JAMES GIBERSON.

1. The statute of limitation will run against the boards of proprietors in New Jersey, and twenty years' adverse possession of lands will bar their right of entry or recovery.

2. A person in possession of lands lying in the "angle," or disputed territory between East and West Jersey, under claim of title derived from the council of proprietors of West Jersey (the true boundary not being ascertained), is not to be regarded as a naked trespasser without color of title, though the land eventually prove to be in East Jersey.

3. The adverse possession necessary to bar a right of entry must be actual possession continued for twenty years. If there be an intermission of occupancy, or of the acts which constitute the actual possession for an intervening period during that time, although during such period the party may have continued to claim title, pay taxes, and may have surveyed the tract, the statute will not bar. Paying taxes or surveying out land do not constitute possession.

4. Repeated acts of trespass upon unoccupied land will not constitute possession, or oust the true owner, whose title by law draws possession to him: for that purpose possession must be notorious, continued, and exclusive.

————

Cornelius and Empson v. Giberson.

This cause was tried, before Justice Potts, in the Ocean County Circuit Court, in which the action was brought, and was removed into this court by writ of error.

The action was trespass *quare clausum fregit* upon lands in Ocean county, and the plea was not guilty. The plaintiffs in error, who were also plaintiffs below, deduced their title from the East Jersey proprietors, and the defendant deduced his from the proprietors of West Jersey, and one of the questions in the cause was, whether the lands constituting the *locus in quo* were on the east or west side of the partition line between East Jersey and West Jersey, or where is the true partition line, the plaintiffs contending that the north termination of the line of partition between East Jersey and West Jersey is where the most northerly branch of the Delaware river, being the branch which retains the name of the Delaware, is intersected by the parallel of 41° 40' north latitude, and the defendant contending that it is at the point fixed by the convention between New York and New Jersey, in 1772, as the northern point of New Jersey, at the mouth of the Machackamac river, where it enters the Delaware. Upon this point the charge of the court was in favor of the position taken by the plaintiffs, and did not, therefore, come in review in this court on the writ of error.

The plaintiffs deduced their title from the proprietors of East New Jersey, as follows :

1. A warrant from the East Jersey proprietors to Newell, Debow, and Brinley, for 10,000 acres, dated May 20, 1835.

2. A survey and return to Newell, Debow, and Brinley, dated August 27, 1835, for 1343.65 acres, and a second survey and return, dated July 15, 1840, to Debow and Brinley (Newell having died) for 1067.82 acres.

3. A deed from Debow and Brinley to George Cornelius, dated July 2, 1849, for 1392.04 acres, part of the two surveys above mentioned.

4. A deed from George Cornelius to his coplaintiff, Christian D. Empson, for one undivided half of the tract conveyed to Cornelius by the last deed, dated July 2, 1849, and acknowledged September 27, 1849.

The defendant deduced his title from the proprietors of West Jersey, as follows:

1. A return of a survey to William Griffith, dated February 10, 1809.

2. A second return of a survey to William Griffith, dated October 13, 1809.

3. A deed from William Griffith to Benjamin B. Cooper, dated December 24, 1811.

By divers mesne conveyances which did not come in question, the title of Cooper came to the defendant, Giberson, by a deed dated July 29, 1848.

The surveys and conveyances under which the plaintiff claimed, and also the surveys and conveyances under which the defendant claimed, included the *locus in quo*.

On the 4th of May, 1829, Samuel J. Read and Samuel G. Wright, who held the title claimed under the West Jersey proprietors, made partition of the whole tract between them, and in that year Samuel J. Read commenced cutting wood off the south part of the tract, and continued this cutting through 1830, 1831, and 1832. This wood was cut from about 500 acres of the south part of this tract, and the woodcutters erected cabins on the tract where they cut, and occupied them while engaged in cutting. This part of the tract was some distance from the *locus in quo*. Cornelius, one of the plaintiffs, had cut on ninety acres of the tract; and upon a claim being made by Samuel J. Read, it was submitted to arbitrators, who awarded $675 damages to Read, which were paid by Cornelius. This was in 1836. Read surveyed around the tract once or twice after the division between him and Wright, and paid taxes for the tract. In 1837, after the death of Read, his administrators having obtained an order of the

Orphans Court, to sell the whole real estate of Read, caused this whole tract to be surveyed, and sold the corded wood on the ninety acres cut off by Cornelius. In 1846, part of the tract was sold in parcels, and the *locus in quo* was then sold to the defendant, Giberson, who entered and held the possession. This suit was commenced June 4, 1850.

Upon submitting the cause to the jury, the court charged as follows:

This is an action of trespass, brought by George Cornelius and Christian D. Empson against James Giberson, for the recovery of damages for the alleged cutting, coaling, and carrying away wood and timber on and from the lands of the plaintiffs by the defendant. The defendant pleads that he is not guilty of the trespass laid to his charge.

Under this issue, the plaintiffs are bound to prove—

1. That at the time of the alleged trespass they were in possession of the property, and that rightfully, as against the defendant.

2. That the defendant committed the trespass.

To establish the possession, the plaintiffs produce and rely upon a documentary title, derived originally from the East Jersey proprietors.

This title consists—

1. Of a warrant to Samuel C. Newell, Debow, and Brinley to survey 10,000 acres, and two surveys and returns, the first to Newell, Debow, and Brinley, of 1343.65 acres, dated 27th August, 1835; the second to Debow and Brinley, survivors (Newell having died), 1067.82 acres, dated July 15, 1840.

2. A deed from Debow and Brinley for 1392.04 acres, part of the two above mentioned tracts, to George Cornelius, dated July 2, 1849.

3. A deed from Cornelius to Empson of one undivided half part of the same, dated July 2, 1849, acknowledged September 27, 1849.

Cornelius and Empson *v.* Giberson.

These conveyances vest in the plaintiffs whatever right and title the East Jersey proprietors had in the premises in question.

It is in evidence that the premises described in these conveyances cover the land upon which it is alleged the cutting, &c., complained of as a trespass was done.

Title carries with it, always, a constructive possession of land, which is sufficient to manintain trespass, even though no actual possession is shown ; and therefore this documentary title is all that it was necessary for the plaintiffs to show, in the first instance, to maintain their action.  Their title, you perceive, commences July 2, 1849, the date of the Cornelius deed to Empson ; if you believe it was actually executed and delivered at that time.  It was not acknowledged until September 27, 1849, and was then in the grantor's possession.

Then, as to the alleged trespass, your inquiry is limited to the period between the 2d of July, or the 27th September, 1849, whenever it was that the plaintiff's title vested, and the 4th of June, 1850, the commencement of this suit.

There is evidence that the timber has been cut almost entirely off of about 365 acres of this land ; 172 acres in what is called the south tract, and 193 acres in what is named as the north tract, as exhibited in the map produced before you.

A good deal of evidence has been laid before you as to the time of the cutting and coaling of this timber, the place where it was cut, the quantity and the value.  I leave this evidence with you, with the simple instruction, that the plaintiffs, if entitled to recover, can only recover damages for the wood and timber cut by the defendant, or by persons in his employ, on the premises actually belonging to Cornelius and Empson, the plaintiffs, between the time when their joint title actually commenced, by the delivery of the deed from Cornelius to Empson, and the 4th of June, 1850, when this suit commenced.   Whether this title

commenced at the date of the deed, 2d July, 1849, or at the date of the acknowledgment, 27th September, 1849, is a question of fact for you to determine.

Delivery of the deed is necessary to complete a title by deed. In the absence of evidence to the contrary, the law will presume a deed to have been delivered on the day it bears date; but this presumption may be rebutted by circumstances or facts. A deed, however, is good if delivered without being formally acknowledged before an acknowledging officer.

This is all I deem it necessary to say on the question of the amount of damages, and I proceed to the more serious questions in the cause.

The defendant puts his defence upon two grounds.

1. Title.

2. Adverse possession for twenty years and upwards.

He exhibits a title from the West Jersey proprietors to William Griffith, February 10, 1809. Griffith sold to Benjamin B. Cooper, one half the tract; which came by several conveyances to Samuel J. Read, in 1826. Griffith sold the other half to Sykes, who conveyed to Samuel G. Wright, in 1824.

Read and Wright made a division of the premises in 1829.

Read's share embraces the premises in dispute. He died in 1836.

Giberson claims through the administrators of Read, by deed dated 29th August, 1846. It will be seen, therefore, that the plaintiffs exhibit a title from East Jersey proprietors in 1835, the defendant from West Jersey proprietors in 1809.

This presents the naked question, to which of these boards of proprietors this land originally belonged, or, is the land in East or West Jersey?

The question fairly meets us in the case, and we must dispose of it. For the hazard the court runs of falling into

error in the haste of a trial at the circuit, it has the consolation of knowing that its errors are open to correction elsewhere.

The first inquiry is, where is the true beginning point of the East and West Jersey division line on the Delaware river; is it where the latitude 41° 40′ north intersects the river, or is it at the mouth of the Machackamac?

The plaintiffs insist that it is the former, the defendant the latter. Whichever may be found to be the true beginning point, a straight direct line run from thence to the south station point, it is admitted on all hands, will give us the true line. The title to New England, New York, and New Jersey being originally in the king of England, he, by royal grant on the 12th March, 1664, conveyed these provinces to the Duke of York by a general description, which it is unnecessary for me here to repeat, as it has been read in your hearing.

The Duke of York, in 1664, conveyed New Jersey to Berkely and Carteret, describing it as—all that tract, &c., adjacent to New England, bounded by the main sea, Hudson's river, and the Delaware, extending northward as far as the northernmost branch of the said bay or river Delaware, which is in 41° 40′ of latitude, and thence in a straight line to Hudson's river, in latitude 41°.

The commission and the instructions of Berkely and Carteret to Governor Carteret, of 10th February, 1664, re cite the same boundary in the same language as the deed last mentioned.

The Dutch conquest having rendered these titles doubtful, the king, in 1674, made his second grant, which is in the same language as the first. And the proprietors having agreed to divide the province in the meantime—on the 29th July, 1674, the Duke of York conveyed East Jersey to Carteret, describing its bounds "as extending to Barnegat on the east, and then bounded on the west on a straight line from the said creek called Barnegat to a

certain creek in Delaware river next adjoining to and be-
low a certain creek in Delaware river called Renkokas kill,
and from thence up the said Delaware river to the northern-
most branch thereof, which is in 41° 40' latitude, and in
the north crosseth over thence in a straight line to Hudson's
river, in 41° of latitude." The western boundary, having
been abandoned by Carteret in the deed of partition soon
afterwards made, is unimportant. But this conveyance
fixes the New York and New Jersey division line, by the
same description, substantially as is used in the original
grant to Berkely and Carteret.

The next deed necessary to notice is the quintipartite
deed, or the deed of partition between the proprietors, by
which East Jersey was released to Carteret, and West Jersey
to Penn, Laurie, Lucas, and Bylling. This was in 1676,
and, being the deliberate act of the proprietors themselves,
is the important document in this controversy.

It recites the northern boundary of the province thus:
" to the northward as far as the northernmost branch of the
said bay or river of Delaware, which is in 41° 40' of lati-
tude, and crosseth over thence in a straight line to Hudson's
river, in 41° of latitude."

It also recites that Fenwick had purchased one moiety,
and conveyed it to Penn, Lucas, Laurie, and Bylling, and
that the said parties had agreed to make partition, Car-
teret to have East Jersey, described as " all that easterly
part, share, or portion of the said tract lying on the east
side and eastward of a straight and direct line drawn
through the said premises from north to south, and the
others to have West Jersey, lying on the west side and
westward of said line ; and then proceeds : Now these
presents witness, &c., that said Penn, &c., bargain, sell,
and release to Carteret all those easterly parts, shares, and
portions, &c., so granted and conveyed by the Duke of York
to Berkely and Carteret as aforesaid, extending eastward
and northward along the seacoast and the said river called

Hudson's river from the east side of a certain place or harbor lying on the southern part of the same tract of land, and commonly known as Little Eggharbor, to that part of the said river called Hudson's river, which is in $41°$ latitude, being the furthermost part of the said tract of land, &c., which is bounded by said river, and crossing over from thence, in a straight line extending from that part of Hudson's river aforesaid, to the northernmost branch or part of the before mentioned river, called Delaware, and to the most northerly point or boundary of the said tract, &c., so granted, &c., to Berkely and Carteret, now by the consent and agreement of the said parties to these presents called and agreed to be called the north partition point, and from thence, that is to say from the said north partition point, extending southward, by a straight and direct line drawn from the said north partition point southward through the said tract of land, unto the most southerly point of the east of Little Eggharbor aforesaid, which said most southerly point of the east side of Little Eggharbor is now, by the consent and agreement of the said parties to these presents, called and agreed to be from henceforth called the south partition point; and which said straight and direct line drawn from the said north partition point through the said tract of land unto the said south partition point is now, by the consent and agreement of the said parties to these presents, called and agreed to be called the line of partition, which is the line herein before mentioned to be intended, by the consent and agreement of the said parties, for the dividing and making a partition or separation of the said easterly part, share, and portion from the westerly part, share, and portion of the said tract, &c., to have and to hold, &c. (This disposes of East Jersey.)

And said presents further witness, that in further pursuance and performance of the said herein before recited agreement, and for the further perfecting the said partition,

so agreed to be as aforesaid, &c., the said Carteret bargains and sells, &c., to Penn, &c., all that westerly part, share, and portion, &c., which said part, &c., is and are extending southward and westward and northward along the seacoast and the before mentioned Delaware, &c., from the said south partition point, before mentioned to be on the east side of Little Eggharbor, unto the said north partition point, herein before mentioned to be in the before mentioned northernmost branch or part of Delaware river aforesaid, and from thence, that is to say from the north station point before mentioned, by the straight line, &c., to south partition point.

Now it seems to me impossible to mistake the beginning and ending of the straight partition line mentioned in this deed, the former at 41° 40′ north latitude on the Delaware, the latter at Little Eggharbor; and that this line, wherever it was, was then, in the year 1676, fixed as the established line between the two divisions by the solemn and deliberate agreement of the parties.

The recital in the deed, to which the subsequent descriptions of the premises refer, describes the point as the northernmost branch of the said bay or river Delaware. But where on that branch? Not necessarily at its junction with any other branch. The words are not so; and certainly not there, if a particular place is mentioned which is not at the junction. A branch of a river is sometimes a stream hundreds of miles in length, and it is the branch which is in 41° 40′ of latitude. Suppose it had been the Delaware, instead of a "branch of the Delaware," (both terms signify a river or stream)—the Delaware river, which is in 41° 40′—can any one say that would have meant the mouth of the Delaware, though three hundred miles from the point of latitude described? I think not.

The north station point claimed by the plaintiffs answers the description, it is in the northernmost branch of Delaware. It is in latitude 41° 40′, while I cannot find

Cornelius and Empson v. Giberson.

a word in the deed which indicates the mouth of the Machackamac to be the point meant. That is not the northernmost branch of the Delaware, for there are branches of that river further north. It is not in latitude 41° 40′. I cannot see that the Machackamac answers the description better than the Musconetcong, the Pequest, or the Paulinskill. In early times the junction of the Lehigh and the Delaware were known as the forks of the Delaware, and the main river was the northernmost branch of the Delaware. If in our search for the true point in the language of this deed, we strike out the words, " which is in the latitude 41° 40′," I am entirely at a loss to know where the point intended is to be found. If we leave them there, we must go to the point claimed by the plaintiffs. I cannot, therefore, but think that the true construction of the quintipartite deed calls for the north point of beginning claimed by the plaintiffs.

But let us see if there is anything in the subsequent history of these titles to show a different intention. I do not attach much importance to the fact, that the deed of confirmation from the Duke of York to the twenty-four proprietors, in 1682, and the duke's second grant to the West Jersey proprietors, in 1680, contains the same description, by recital, of the north point of boundary, nor to the various subsequent acts and documents to which we have been referred, mentioning the same boundaries in t e same language. They only show that no ambiguity or want of certainty in the descriptions had been supposed to exist in the language which was used in the quintipartite deed.

Nor does it seem to me at all important to this question that the colonial legislature, in the erection of counties, seemed to have no regard to the descriptions of their bounds with respect to the true division line, even long after the date of the deed. These were political divisions, not affecting the rights of the proprietors. There was no

actual line run, and lines were manifestly spoken of as in East or West Jersey, with little regard to where that line might be found eventually to run when it came to be surveyed.

The tripartite deed, in 1719, made between commissioners of New York and East and West Jersey, however, is a document which bears, I think, upon the question, as to how the language of the quintipartite deed was understood in both colonies at that day.

The commission was appointed, in pursuance of acts of New Jersey and New York, to search for and ascertain which was the most northernmost branch of Delaware river, and to find out that place of the said northernmost branch that lies in the latitude of 41° 40', which, says the preamble to the deed, "is the north partition point of New York and New Jersey." They discharged their duties, and found that the place designated was on the Fishkill (now Delaware), and at the Indian town of Cashughtouch, being in 41° 40', and which I understand to be the very point claimed by the plaintiffs here; and they executed a deed certifying that to be the true beginning point required by that description, inserting also in the deed, by way of parenthesis, that it is likewise the north partition point between the eastern and western divisions of New Jersey.

As to the validity of this report, certificate, or deed tripartite, as it is called, or its binding obligation, I say nothing. It is now an immaterial question, for this deed did not finally settle the line between New York and New Jersey. The matter was still agitated from time to time, and finally a dividing line was established by the commissioners of 1772, which I shall have occasion to advert to, because it seems to have had considerable agency at least in perpetuating, if it did not in fact originate, the long dispute which has now existed between the two boards of proprietors under whom these parties claim.

The quintipartite agreement was executed in 1676. The above period mentioned New York and New Jersey line was finally settled in 1772, ninety-six years after.

From the date of the quintipartite deed, in 1676, eleven years elapsed before any serious attempt was made to run the line called for; then, in 1687, Keith, surveyor general of East Jersey, by order of the eastern board, ran a line about sixty miles from Eggharbor to Dobie's plantation on the Raritan, and then abandoned it, finding his course too far south. Then fifty-six years more elapsed until 1743, in which year John Lawrence ran a line, now claimed by the East Jersey board to be the true line, from 41° 40' on the Delaware to the south station point; and in 1772 the partition line was settled between New York and New Jersey, fixing the mouth of the Machackamac as the beginning point of the line between the two colonies.

Although it seems quite clear that the West Jersey proprietors never agreed formally to this line of Lawrence as the true line, yet there is a good deal of evidence to show that from the time it was run in 1743, to the date of the partition with New York, in 1772, that board at least partially acquiesced in it; and I think, *prima facie*, it may be taken as the true line, as far as he actually run it, or fixed monuments showing where it is.

From 1744, down indeed to 1775, surveys and warrants for relocations are in evidence, in which the West Jersey board acted upon the principle that Lawrence's was the true line of partition. I need not recur to them; they have been before you, and largely commented on by counsel.

And from all the evidence in the cause, as to the action of the West Jersey Board, I think it may be fairly inferred that previous to the New York partition, in 1772, the western proprietors did not seriously question, if at all, that the north beginning line of the quintipartite deed was on the Delaware where it is intersected by the latitude of 41° 40'.

Then, did the partition between New York and New Jersey, in 1772, change the boundary between East and West Jersey? or, in other words, did it change the north beginning point from 41° 40′ to the mouth of the Machackamac, on the Delaware?

1. The argument is, that the commission which had this matter in charge found the true beginning point of the New York and New Jersey north line there, and that that north beginning point is the true point intended by the quintipartite deed; for it is not pretended that the commissioners who fixed this boundary line had any power to fix the beginning point of the East and West Jersey partition line, as such, or that they claimed any such power, or that they actually meant to do anything of the kind.

But it is very clear that the line fixed between New York and New Jersey by this commission was a compromise, if not an arbitrary line. Their authority was not merely to find the true line intended by the deed of grant, but to ascertain, settle, and determine the boundary, and they reported, not that they had ascertained what the line called for by the title was, but that they "did determine" that the boundary or partition line "should be" a straight line from the mouth of the Machackamac, on the Delaware, in the latitude 41° 21′ 37″, to the latitude of 41° on the Hudson. It was, I think, an arbitrary line, fixed with but little reference to the boundary described in the grants, and was not acceded to until an ineffectual effort to resist it had been made by East Jersey.

With the merits of this question we have nothing to do here. The two colonies had passed acts giving the authority for this commission; they finally adopted the result, and the line is settled between New York and New Jersey. But nothing that the two legislatures did, or the commissioners, or the king in council, struck out one word or letter of the deed quintipartite, or changed the property rights, as they stood between the eastern and

western proprietors. Where there line was before, it was after this settlement of the New York line.

There is, gentlemen, a great deal of evidence of various kinds going to show the views entertained in relation to this north partition point between East and West Jersey, by individual proprietors, by the respective boards, by minutes and resolutions and acts. But in the questions which constantly arise in respect to the boundary of lands, there is one safe, sound, salutary rule which should always govern us, and that is, to abide by the language of the deed, where the meaning sufficiently explains itself. Evidence *aliunde*, outside of the instrument, may be resorted to, and must be resorted to when the meaning cannot be found in the instrument itself, but only then.

I am of opinion that the language of the quintipartite deed sufficiently explains itself; that its meaning is apparent on its face, and that it fixes the north partition point of the line between East and West Jersey, on the stream now known as the river Delaware, where it is intersected by the latitude of 41° 40'.

If from the evidence before you, you shall be of opinion, therefore, that a straight and direct line from that point to the south partition point will run to the westward of the premises in question, then my instructions to you are, that the documentary title of the defendant fails, and the plaintiffs are entitled to recover, unless the defendant has made good his second ground of defence—and which we are in the next place to examine.

2. For, in the second place, the defendant relies upon a possession of upwards of twenty years held adversely to the plaintffs' title.

The defendant holds under the West Jersey proprietors, who conveyed this land to William Griffith, in 1809; and if you believe that this title was acquired in good faith, then it had its origin in a claim of right, and adverse to

the plaintiffs and those from whom their title came, to wit, the East Jersey proprietors.

Two parties cannot have possession adverse to each other at one and the same time, and if the defendant and his grantees show an adverse possession for twenty years continuously, it operates as an ouster of the eastern proprietors and their grantors.

I shall not trouble you by going back further than the Read claim. It is in evidence, by the testimony of Mr. Joseph Read, that Samuel J. Read was in the actual occupation of part of the premises, in the fall of 1829, soon after the partition between him and Samuel G. Wright; that he had cabins erected on the premises, and that he cut and coaled the timber on a large portion of the tract; and that he continued in such occupancy, frequently exercising acts of ownership over it up to the time of his decease, in 1836. There is evidence that Mr. Haines ran out the property repeatedly for Mr. Read during his life, and for his representatives after his decease.

It is in evidence that Mr. Read's representatives procured an order to sell the land, or a part of it, in 1837; that they sold the portions of it on which Giberson is alleged to have committed this trespass to Giberson and Stephens and Grover, in 1846, at public sale, and Stephens and Grover sold to Giberson, in 1848; that during the interval between 1836, the death of Read, and 1846, the date of the sale, the administrators exercised vigilance in protecting the property against trespassers, and that Mr. Cornelius and others were stopped from cutting on the premises.

It appears that soon after Giberson bought, he entered into possession of the property, and commenced cutting, and that he was so in possession and cutting on the premises, in 1849, when the plaintiffs purchased of Messrs. Debow and Brinley.

I advert thus briefly to the evidence. It is all before you,

and you are the judges of the weight due to it; you will take it altogether, and judge of it for yourselves.

My instructions to you are, that if, upon the whole evidence in reference to the question of possession, you believe—

That the adverse possession on the part of the defendant and those under whom he claims is sufficiently shown to have continued uninterruptedly for a period of twenty years prior to the commencement of this suit, the defendant will be entitled to your verdict.

In reference to what constitutes a legal adverse possession or occupancy for the purpose of a bar to an action of trespass, I have to say to you—

1. The possession must have been originally taken under a claim hostile to the title of the plaintiffs and those under whom they hold, and must have been so continuously held by the defendant and those under whom he claims far at least twenty years previous to the commencement of the suit. It is not necessary that the claim should originate in a rightful title, but it must be a possession under claim or color of title, and exclusive of any other right.

2. Adverse possession is not to be made out by inference, but must be established by clear and positive proof, because every presumption is in favor of possession in subordination to the title of the real owner.

3. A claim or color of title sufficient to destroy all presumption that the defendant was in possession under the plaintiffs or under his grantors, or by their permission, is an adverse possession.

4. To constitute an adverse possession, there need not be a fence, building, or other improvements made by the claimant upon the land. It is sufficient if he shows the exercise of visible and notorious acts of ownership over it after an entry under claim and color of title.

**B**

5. Where acts of ownership have been done upon land, which from their nature indicate a notorious claim of property in it, and are continued for twenty years with the knowledge of an adverse claimant, without interruption or an adverse entry by him, it is evidence of an onster of a former owner, and an actual adverse possession against him, if the jury think the property was not susceptible of a more strict or definite possession.

6. Neither actual occupation, cultivation, or residence are necessary to constitute actual possession; where the property is not susceptible of permanent useful improvement, public acts of ownership, such as one would exercise over his own property, and would not exercise over another's, is all that is required. We cannot expect the same evidence of occupancy of wondland as of farm land.

7. An entry into possession of a tract of land under a deed containing specific metes and bounds gives a constructive possession of the whole tract, if not in any adverse possession, although there be no fence or enclosure round the ambit of the tract, and an actual residence only on a part of it. The entry is coextensive with the grant. A recorded deed and entry is notice of the tract of which possession is taken.

8. A good title originally is not necessary, nor any title. Color of title is received in evidence to show the possession to be adverse.

If applying these principles to the facts of this case, as you have them in evidence, you shall be of opinion that the defendant and those under whom he claims have had an adverse possession of the premises upon which the trespass is alleged to have been committed, as against the plaintiffs and those under whom they claim, for twenty years or more prior to the 4th day of June last, then your verdict should be for the defendant; or if you believe the premises in question to be west of the true partition line, that is in West Jersey, the defendant is entitled to your

verdict independent of his proof of adverse possession, for when he has the rightful title.

But if you believe the premises in question are in East Jersey, and the defendant has not had such adverse possession for twenty years, then your verdict will be for the plaintiffs, with such amount of damages as you may find, which is usually the value of the timber proved to have been cut.

Whereupon the plaintiffs excepted to the following portions of said charge, *viz. :*

1. "If upon the whole evidence, in reference to the question of possession, you believe that the adverse possession on the part of the defendant and those under whom he claims is sufficiently shown to have continued uninterruptedly for a period of twenty years prior to the commencement of this suit, the defendant will be entitled to your verdict."

2. "A claim or color of title sufficient to destroy all presumption that the defendant was in possession under the plaintiffs, or under their grantors, or by their permission, is an adverse possession."

3. Also, collectively and separately, to each and all of the seven instructions given to the jury in reference to what constitutes a legal adverse possession.

4. "If applying these principles to the facts of the case, as you have them in evidence, you shall be of opinion that the defendant and those under whom he claims have had an adverse possession of the premises upon which the trespass is alleged to have been committed, as against the plaintiffs and those under whom they claim, for twenty years or more prior to the 4th day of June last, then your verdict should be for the defendant."

5. "Or if you believe the premises in question to be west of the true partition line, that is in West Jersey, the defendant is entitled to your verdict independent of his proof of adverse possession, for then he has the rightful title."

The plaintiffs then called upon the court to charge—

1.  " That it appearing, by the documents, proofs, and admissions of the parties, that the lands in controversy, lay in the angle formed by two lines, one running from the said south station point to the Delaware, at 40° 41', and the other more eastwardly to the Delaware, at the mouth of the Machackamac, in latitude 41° 20', and are held by the plaintiffs under East Jersey surveys, that the plaintiffs have under their East Jersey surveys a good and perfect title to said lands, and that the defendant can derive no title to said lands through their West Jersey or Griffith survey," which the court declined, except so far as is already contained in said charge.

2.  " That the facts and circumstances proved on the part of the defendant cannot establish for him any right by possession to said lands," which the court declined to do.

3.  " That the acknowledgment of General Read's right to the Griffith survey by one of the plaintiffs, made twelve or thirteen years before the plaintiffs' title accrued to the land now in controversy, or any letters or admissions made by Samuel G. Wright, cannot affect the plaintiffs' right to the land or their right of recovery in the present suit," which the court declined to do.

4.  " That the plaintiffs are therefore entitled to recover the value of the damages, with interest, by way of damages done by the defendant on the lands in controversy between 2d July, 1849, and the 10th June, 1850," which the court declined to do : to all which the plaintiffs excepted, and prayed bills of exceptions, which were signed and sealed accordingly.

The cause was argued before the CHIEF JUSTICE and Justices OGDEN and POTTS, by *Vredenburgh* and *Nevius,* for the plaintiffs, and by *Browning* and *Dayton,* for the defendants.

*Vredenburgh,* for plaintiffs.

The only question is whether the verdict in this case, founded upon the claim of adverse possession, can be maintained at law?

The cutting, which is the trespass complained of, was between 1848 and 1851; the suit includes from the fall of 1849 to the summer of 1850. The *locus in quo* is 366 acres, situate in Dover township, Ocean county, in the centre of the pines. There is no house or dwelling on this tract, and there is none on any part of the Griffith survey, except one or two erected by claimants under the East Jersey surveys and the deserted woodchoppers' cabins. So far as is disclosed by the evidence, the 366 acres was a tract of primeval forest, on which the foot of civilized man had never trod, until the surveyor general of East Jersey, in 1836, made the survey under which the plaintiffs claim. The title of the plaintiffs from the East Jersey proprietors is complete, and includes the tract cut off.

The defendant claims title under the board of proprietors of West Jersey. The survey and every mesne conveyance recites that the tract is in the angle made by Lawrence's line, which intersects the Delaware at 41° 40′, and is the line claimed by the East Jersey proprietors, and the line to the mouth of the Machackamac, which is the line claimed by the West Jersey proprietors.

The line to 41° 40′ was settled by the tripartite deed and by the commission of the king, George I, in March,1769,and by the act of 1719. *Rev. Stat.* 17. This was acquiesced in by both boards as the line, until the commissioners appointed to settle the line between New York and New Jersey, fixed the northern termination at the mouth of the Machackamac, or at 41° 27′ on the Delaware, instead of 41° 40′.

These grants on their face show that they were grants of lands claimed by others, and possession under them is not

like a possession under a title believed to be undisputed, but which proves defective.

At the trial, the plaintiffs' counsel were absorbed in the question of title, and did not fully present their views on the question of adverse possession.

1. What is the effect of naked possession without color of title? Clearly that it extends no further than actual occupancy or enclosure extends; and possession of one part or corner of the tract will not oust the owner from or bar his title to another part of the same tract held by the same title. *Spencer* 490; *Den* v. *Hunt*.

2. What effect does entry under color of title have in extending adverse possession? The distinction is this, that where a party enters upon a tract of land under a *bona fide* claim of title by and giving bounds to the whole tract, and actually cultivates or encloses a part of it under such claim, and exercises occasional acts of ownership over the whole, such occupation shall be deemed possession of the whole tract.

But this principle only can apply to small tracts, as to woodland appurtenant to a farm, else a void paper title to 600,000 acres might become valid by actual occupancy of one acre for twenty years. Neither the decision, nor the equity of the decision, in *Den* v. *Hunt* applies to such a case as this; and even in cases where it does apply, the party claiming by adverse possession must show such acts of ownership for twenty years over the part not within enclosure.

The grant of the king, through the Duke of York, to the proprietors and the quintipartite deed of partition gave the East Jersey proprietors a notorious possession, which this court cannot ignore: this possession continued until 1835. If General Reed took possession of one part of the Griffith survey, in 1829, others, under East Jersey grants, erected houses on and took possession of other parts of that survey shortly after, and still hold it, to which

did the possession of the vacant part enure ? It is at most a mixed possession, which does not oust the true owner of the title. *Angell on Lim.* 442 ; 4 *Wheat.* 213, *Barr* v. *Gratz* ; 3 *Greenl. R.* 266 ; 3 *S.* § *R.* 509. A mere entry without expulsion is no disseisin. 5 *Cowen* 374 ; 6 *J. R.* 197.

The statute is prevented from running by the letter of Joseph G. Read, one of the owners to F. W. Brinley, January 12, 1842, asking for delay of suit.

From 1836 to 1840, Brinley and Debow cut on 1392 acre tract, part of Griffith survey. This was an entry by the two owners claiming title ; then there was no bar by adverse possession, and this entry by the real owners was not a mere trespass, but gave them possession of the unoccupied and unenclosed land, even if it had been lost before.

The entry under a deed that on its face gave notice of disputed title was not a *bona fide* entry under color of title. *Spenc.* 493 ; 5 *Cox.* 350 ; 1 *Ib.* 284 ; 5 *Ib.* 346 ; 8 *Ib.* 600 ; 12 *J. R.* 365 ; 4 *J. R.* 122 and 182 ; 5 *Rick.* 131 ; *Angell on Lim.* 143, *n.*, 2 ; 5 *Dana* 65.

*Nevius*, on same side, referred counsel to 7 *Iredell* 175, on position that proprietors are not bound by statute of limitations, and to 5 *Pet.* 354, *Clark's Lessee* v. *Courtney*, and 3 *Wash. C. C.* 475, *Potts' Lessee* v. *Gilbert*, on position that where two surveys lap, possession under later survey without actual occupancy of lap will not bar.

*Browning*, for defendant.

The *locus in quo* is part of the survey made to Griffith in 1809, and of the half which in the partition between Read and Wright, in 1829, was set off to Read, and are the 366 acres which Read's heirs conveyed to the defendant in 1846. The south end of Read's part was cut off and coaled by him ; also, in 1836, he cut off and coaled a part east of

the *locus in quo*, and after this the plaintiff, Cornelius, having cut off ninety acres of Read's part, northeast of the *locus in quo*, submitted Read's claim for damages to arbitrators, and paid up the award.

The possession under which defendant claims was not a naked possession, but under color of title. The correct location of the partition line between the proprietors of East Jersey and West Jersey is not material to the present argument; but we are prepared to maintain, whenever it does become a material question, that the true northern point of New Jersey, as designated and called for in the old grants and partition, is the point settled by the act of 1772 at the mouth of the Machackamac river. This is a *terrestrial landmark* called for in the deed, and must prevail over the *celestial* mark, to be ascertained by measurement and calculation: that is only matter of description to identify the visible monument.

The act of 1688, and the action of the commissioners under it, the language of the Duke of York's grant (*L & S.* 63) and of the quintipartite deed (*L. & S.* 67), the letter of Laurie and others to Hartshorne, of June 26, 1676, (*Smith's Hist.* 80), Coxe's letter, in 1687, (*Smith's Hist.* 546), the compromise, in 1688, between Coxe and Barclay (*Smith's Hist.* 196), the acts of March 11, 1764, (*Allison* 25), and of March 27, 1719, (*Neville* 64), and the act of 1764, (*Allison* 262), the action of the commissioners appointed under it, in 1769, and the act of 1772, settling the north point of New Jersey all go to sustain this position.

The fact of adverse possession, was properly left by the court to be settled by the jury. 10 *Peters* 412, *Ellicott*, v. *Pearl* ; 11 *Peters* 41, *Ewing* v. *Burnet : Spencer* 492, *Den* v. *Hunt* ; 13 *How.* 477, *Pillow* v. *Roberts*.

That the statute of limitations would run against the proprietors. was ruled a few years since in the case of *Dend. Lamassena* v. *Dayton*, in the Essex Circuit, by Justice Nevius.

*Dayton*, on same side.

The exceptions may be reduced to three points.

1. That the statute of limitations will not run against the proprietors.

2. That a deed from the West Jersey proprietors for lands in East Jersey gives no color of title.

3. That possession of wild lands by entry and claim under a deed with definite boundaries will only be a bar as to such part as was enclosed or in actual cultivation for twenty years.

1. The proprietors are bound by the statute of limitations like all other persons. The first act of limitations in New Jersey was that of February 10, 1727–8. *Allison* 72. The act of 1623, *Allison* 74, was never incorporated into the legislation of the colony, as appears by *Den* v. *Pissant*, *Coxe* 222. The act of February, 1799, probably grew out of this intimation by the court.

Under the act of 1787, (*R. S.* 652) does sixty years' possession bar a proprietory right? Its language is the same as the subsequent act of 1799. Under the second section, thirty years' possession will bar the proprietors. The first section applies when there is no claim or color of title, the second only to possession founded on color of title. The The present act, *Rev. Stat.* 95, § 10 and 11, has for this purpose the same phraseology as the act of 1787.

In *Den d. Gardner* v. *Sharp*, 4 *Wash. C. C. R.* 609, 616, and 617, it was ruled that length of time would bar proprietors. And why would it not; At common law it does not bar the crown, but in New Jersey it does bar the state, (R. S. 95, § 14,) and the proprietors have now no prerogative of sovereignty; they are a mere company of joint owners, not even a corporation.

2. The *bona fides* of the possession under color of title was submitted by the court to the jury as a question of fact, and this cause is here upon writ of error for errors in law only, not in fact.

Justice Potts, in this matter, followed the ruling in *Den* v. *Hunt*, and this does not go so far as the cases in the courts of the United States. 5 *Cow.* 346, *Jackson* v. *Frost*; 1 *Cow.* 284, *Jackson* v. *Woodruff*; 8 *Cow.* 589, *La From-bois* v. *Jackson*; 9 *J. R.* 180, *Smith* v. *Burtis*; 18 *J. R.* 4, 5, and 361; 1 *Cooke T. R.* 356; 4 *Mason's C. C. R.*, *Prescott* v. *Nevers*; 5 *Pet.* 319, *Clark* v. *Courtney*.

The possession in this case was not not mixed; where one side has actual possession and the other only construc- tive possession it is not a mixed possession; and the board of proprietors never had actual possession.

*Nevius*, for plaintiffs.

1. No adverse possession can exist against the board of proprietors any more than against the state.

2. Party claiming by possession under color of title must show a title taken in good faith.

Here the location and conveyances show upon their face that all parties knew that they were buying a disputed title upon the angle claimed by East Jersey.

The line of partition to which we claim had long been settled and acquiesced in by the proprietors of West Jer- sey; it was settled for nearly half a century; but the West Jersey proprietors are grasping, and claim everything, and this grant to Griffith was made in bad faith for the pur- pose of gaining a title to lands that were disputed. They show no possession for twenty years after the grant, and when parties having surveys for parts of the Griffith tract under East Jersey entered and occupied, they made no at- tempt to oust them.

The mere location or survey of this tract, in 1809, with- out entry was no ouster or trespass, and for it no right of action accrued to the East Jersey proprietors; and when, after twenty years, the grantors of Griffith trespassed upon and *took* possession of part, this did not give to the proprie- tors a right to bring ejectment for other parts not occupied

by them : and until the right of action accrued the twenty years did not begin to run.

The CHIEF JUSTICE delivered the opinion of the court.

To an action of trespass for cutting and carrying away timber, the defendant pleaded not guilty. The controversy, on the trial, resolved itself into a question of title.

The land in controversy lies within the angle or gore formed by a line drawn from the south station point at Little Eggharbor to the north station point upon the river Delaware, at 41° 40' north latitude, as run by John Lawrence, in 1743, and a line drawn from the same south station point to the river Delaware, at the mouth of the Machackamac, the former being the line of partition between East and West Jersey, as claimed by the proprietors of East Jersey, and the latter being the line claimed by the proprietors of West Jersey.

The plaintiffs claim title under the East Jersey proprietors by virtue of two surveys, the first made to Newell, Debow, and Brinley, on the 27th of August, 1835, for 1343 acres, the second to Debow and Brinley, on the 15th of July, 1840, for 1067 acres. Debow and Brinley conveyed 1392 acres, part of the land covered by the two surveys, to George Cornelius, one of the plaintiffs, by deed dated July 2d, 1849 ; and Cornelius, in the same year, conveyed an undivided half part of the tract to Empson, the other plaintiff.

The defendant claims title under the West Jersey proprietors by virtue of a survey to William Griffith, in the year 1809. He also claims title by twenty years' adverse possession.

So far as relates to the documentary title, the charge of the court was in favor of the plaintiffs. Exceptions are taken to that part of the charge only which relates to the defendant's claim of title by adverse possession. A great variety of errors are assigned. Many are clearly without

foundation, and were not insisted on by counsel upon the argument. Those only will be adverted to which were relied on by counsel.

\ 1. It is insisted that the charge is erroneous, because the statute of limitations will not run against the board of proprietors of East or West Jersey. Whatever force there might have been in the position prior to the surrender of the government by the proprietors to Queen Anne, it is not perceived upon what ground it can rest for support since that surrender.

The ancient maxim of the common law, "*nullum tempus occurrit regi*," which is applicable in principle to every sovereignty, rests for its support upon a variety of grounds. One is, that the law intends that the king is always busied for the public good, and therefore has not leisure to assert his rights within the time limited to his subjects. 1 *Bl. Com.* 247.

Another is, that the public interests should not suffer detriment by reason of the neglect or corruption of the public officers. *Hob.* 526, 152, 166.

In the Magdalen college case, 11 *Coke* 746, it was resolved that the king, by general words of an act, should not be barred of any prerogative, estate, right, title, or interest; that he hath a prerogative "*quod nullum tempus occurrit regi*," and, therefore, that general acts of limitation do not extend to the king.

But the doctrine is applicable to every sovereignty, independent of any claim of prerogative, and it rests upon the simple ground, that the general words of a statute do not include the government, or affect its rights, unless such construction be clear upon the words of the statute. The rights of the government can only be affected by express words or necessary implication. *United States* v. *Hoar*, 2 *Mason* 312.

The exemption of the council of proprietors from the operation of the statute of limitations can be sustained

upon neither of these grounds. Since the surrender of their powers of government, they have none of the prerogatives or attributes of sovereignty. They can claim no exemption from the operation of general laws. The language of the statute of limitations is broad enough to include them; it extends in terms to all persons, to all lands, and to every action. *Rev. Stat.* 95, § 10, 11.

The language of the first and second sections of the act of 1787, (*Rev. Stat.* 652) is equally broad and explicit, and, if a fair and reasonable interpretation be given to them, they must operate to bar as well the claims of the council of proprietors as of all persons claiming under them.

The opinion of Washington, J., in *Den* v. *Sharp* (4 *Wash. C. C. R.* 616) assumes that a possessory title may be set up against the board of proprietors.

It was earnestly insisted, upon the argument, that there is something peculiar in the character of the title of the proprietors. It is said to be "imperial," "actual," "potential," "vital," "ubiquitous." Admitting the propriety of these characteristics while the proprietors were *de facto* sovereigns, it is not perceived that there is at present anything whatever in the character of their title to distinguish it from that of any other extensive landed proprietor.

The policy of modern legislation, both in England and America, has been to subject the sovereign power itself to the operation of the statute of limitations. By the law of this state, the same lapse of time that bars an individual claim to lands bars the claim of the state. *Rev. Stat.* 95, § 14.

It is not to be assumed that the legislature designed to leave the claim of the proprietors upon higher grounds than that of the state itself.

The second error relied upon is, that the defendant was in possession as a naked trespasser without color of title, and that consequently his title by possession should have

been strictly limited to the land held by him under actual cultivation or enclosure.

The defendant claims under a deed of conveyance and a title deduced from the council of proprietors of West Jersey. So far as the evidence shows, he and those under whom he holds have always claimed by virtue of that title. Conceding that no title whatever passed by the original West Jersey survey to William Griffith, still the defendants are not in possession as naked trespassers. A mere defect of title does not disparage a claim by color of title. Nor does the fact, that the land is described as within the angle or disputed territory between East and West Jersey, show that the claim was made *mala fide* or that it was fraudulent in law. It charges the defendant, undoubtedly, and those under whom he claims with knowledge that the title was questionable ; that the true location of the boundary line was unsettled ; but it does not charge them with knowledge that the title was defective, or with fraud in taking it. Had the true boundary line been definitely established prior to the location of the survey, the question would have been presented in a totally different aspect.

Whether there was or was not *actual* fraud in the location of the survey, was a question for the consideration of the jury, and was properly left for their determination. So far as the evidence shows, there is no ground to assume that there was actual fraud either in the inception or continuance of the claim. The purchase by General Read was for a valuable consideration, and the claim, it is fair to assume, was insisted upon by himself and his heirs in perfect good faith.

A claim to land in East Jersey under a West Jersey survey, originating since the surrender by the proprietors of the powers of government, has, for reasons already suggested, no analogy to a claim under a grant by a foreign government. Such grants are held to involve questions

of national right for the disposition of the government, rather than those of private right for the adjudication of courts. *Jackson* v. *Ingraham,* 4 *Johns. R.* 182.

The third error relied upon is, that the court declined to charge the jury, "that the facts and circumstances proved on the part of the defendant could not establish for him any title by possession to the lands in controversy."

It is objected, *in limine,* that this is a question of fact, and was properly submitted to the jury. What constitutes adverse possession, is a question of *law ;* and if the evidence in the cause, admitting its truth, does not show such possession, it is the duty of the court so to declare. The question for the consideration of this court is, what constitutes adverse possession, and what evidence is necessary to sustain it?

It is a settled rule, that the doctrine of adverse possession is to be taken strictly; it is not to be made out by inference, but by clear and positive proof. Every presumption is in favor of possession in subordination to the title of the true owner. A party claiming title by adverse possession always claims in derogation of the right of the real owner. He admits that the legal title is in another. He rests his claim not upon a title in himself, as the true owner, but upon holding adversely to the true owner for the period prescribed by the statute of limitations. Claiming a benefit from his own wrong, his acts are to be construed strictly. *Jackson* v. *Sharp,* 9 *Johns. R.* 167; *Jackson* v. *Waters,* 12 *Johns. R.* 365; *Proprietors of Kennebec* v. *Springer,* 4 *Mass.* 418; *Den.* v. *Hunt, Spencer,* 491.

To sustain a title by adverse possession, the defendant must prove a continued, open, visible, and exclusive possession. His possession, moreover, must be marked by definite boundaries, designated either upon the land itself or by the description in his deed.

The land must have been in the constant and uninterrupted possession of the defendant and those under whom

he claims the length of time prescribed by the statute of limitations. It must be a continued possession; an occasional exercise of dominion by broken and uninterrupted acts of ownership, either by the same person or by different persons, will not establish a right. The legal title always draws to it the constructive possession, and if the possession of the trespasser is interrupted the possession of the real owner is renewed, and that without actual entry. The possession and the right go together until there is an actual possession adverse to the right. Neither actual residence on the soil nor actual cultivation or. enclosure are necessary. but there must be something tantamount to one or the other of these. No matter how long the real owner is out of actual possession, his title and his constructive possession remain until an actual hostile possession is taken. He may never have made an actual entry or set his foot upon the soil, he is nevertheless, by virtue of his title, in constructive possession. A wrongdoer can derive no aid from title; he rests upon possession alone; the law gives him no constructive possession. Actual occupancy, the *pedis positio*, is his only warrant, and upon that he must rely.

The act of limitations, say the Supreme Court of Pennsylvania, does not prevent the entry of the owner of the land and bringing an ejectment at any time, unless where there has been an actual, continued, visible, notorious, distinct, and hostile possession for twenty-one years. *Hawk* v. *Senseman,* 6 *Serg. & Rawle* 21.

The possession, say the Supreme Court of Massachusetts, which would defeat the plaintiff's claim for damages for the whole trespass charged must have been a *continued* possession, an *actual* occupation to the exclusion of the rightful owner. To extend the principles relative to adverse possession beyond the case of an actual, open, visible, and exclusive possession, would be of the most dangerous consequence, and would be in effect authorizing

trespass by *law.　Proprietors of Kennebec* v. *Call*, 1 *Mass.* 483.

The occupation must be of that nature and notoriety that the owner may be presumed to know that there is a possession of the land adverse to his title, otherwise a man may be disseized without his knowledge.　*Proprietors of Kennebec* v. *Springer*, 4 *Mass.* 418.

There must be, say the Supreme Court of New York, a real and substantial enclosure, an actual occupancy, a *possessio pedis*, which is definite, positive and notorious, to constitute an adverse possession, when that is the only defence, and is to countervail a legal title.　*Jackson* v. *Schoonmaker* 2 *J. R.* 234.

To sustain title by adverse possession, say the Supreme Court of New Hampshire, the defendant must prove a continued, open, visible, and exclusive possession.　*Smith* v. *Hosmer*, 7 *New Hamp.* 441.

Mr. Griffith, whose opinion upon this subject is entitled to the highest consideration, states the rule in clear and explicit terms.　" Mere surveys on waste or outlands unenclosed and uncultivated, or deeds for such lands, or other claim of title, and occasionally cutting and carrying off the wood and timber, is not such a possession as displaces the right owner : such acts as these amount only to entries and trespasses, and may be treated as such at all times. They are not such twenty years' *notice* of an adverse possession of land as the statute intends."　4 *An. Law Register* 1269.

The same principal will be found fully sustained in a great variety of cases.　*Stocker* v. *Berny*, 1 *Ld. Raym*, 741 ; *Viner's Ab. Disseisin, A.* 3 ; *King* v. *Parishoners of Wilby*, 8 *Mod.* 287 ; *Johnson* v. *Irwin*, 3 *Serg. & R.* 291 ; *Gonzalus* v. *Hoover*, 6 *Serg. & R.* 118 ; *Small* v. *Proctor*, 15 *Mass.* 498 ; *Hall* v. *Glidden*, 10 *New Hamp.* 401 ; 2 *Greenl.* 242.; *Boston Mill Co.* v. *Bulfinch*, 6 *Mass.* 233 ; *Brandt.* v. *Ogden*, 1 *J. R.* 156 ; *Doe* v. *Campbell*, 10 *Johns. R.* 477 ; *Wright* v.

*Guier*, 9 *Watts*, 175 ; *Lessee of Potts* v. *Gilbert*, 3 *Wash. C. C. R.* 475.

Does the evidence in this cause on the part of the defendant, assuming it all to have been believed by the jury, show such possession as is required by law to establish a title against the rightful owner ?

The Griffith survey, under which the defendant claims title, was made in the year 1809. The tract is 730 chains, more than nine miles in length. It consisted exclusively of wild uncultivated lands. From 1809 to 1829, no possession is attempted to be shown. In the year 1829, Samuel G. Wright and Samuel J. Read, being the joint owners of the the entire tract, agreed to make partition. The land was surveyed, and the southern moiety allotted to Read. From that period each held his share in severalty. In the fall of 1829, General Read commenced cutting and coaling on his share of the tract, and continued his operations during the years 1830, '31 and '32. During this period, four or five cabins were erected on the land, which were occupied by the woodchoppers with their families. About 500 acres of the southern extremity of the tract were cleared off ; several thousand cords of wood were cut for the use of Dover furnace (iron works belonging to General Read), about six miles distant from the tracts in question.

In the year 1836, there was more wood cut on some portion of the tract, but the exact location or extent of the cutting does not appear by the evidence, nor is it material. In the same year damages were claimed and received by General Read from George Cornelius, for cutting over ninety acres within the limits of the survey. On the 2d of October, 1836, General Read died. In the year 1837, his administrator applied to the Orphans Court of the county of Monmouth to sell all his real estate in that county. The administrators caused the tract to be surveyed. They took and sold the dead wood on the tract of ninety acres which had been cut over by Cornelius. They paid taxes.

In the year 1846, the timber having been injured by fire, a portion of the tract was surveyed, and sold in several parcels. The tract in question was sold and conveyed to Giberson, the defendant, who entered an d held possession to the commencement of the suit, which was on the 4th of June, 1850.

In the period of twenty years, during which adverse possession is sought to be established, no part of the land was under actual cultivation or enclosure. The owner never resided upon it. There was no actual occupancy, save by the woodchoppers. The only improvements were their temporary cabins. From 1832 to 1836 there is no proof of any actual occupancy or visible exercise of ownership over the property. From the death of General Read, in 1836, till 1846, the heirs never entered upon the premises for the purposes of clearing or cultivation or improvement. An occasional entry for the purpose of making surveys, a sale of decayed timber, the payment of taxes, are the facts relied upon to constitute a title by adverse possession. Do these constitute the actual, continued, visible, hostile possession required by law to oust the lawful owner of his rightful possession?

Will an occasional entry upon wild and uncultivated lands for the purpose of cutting wood or making surveys, joined with the payment of taxes, by a party having no legal title, there being no actual residence upon any part of the land, no cultivation, no inclosure, no improvement, no actual occupancy for any purpose whatever, operate to bar the title of the rightful owner? or may several distinct entries and acts of trespass, coupled with temporary actual occupancy for the purpose of cutting wood, be thus united, and constitute one continuous adverse possession?

The question is certainly of great moment in this state, where there are extensive tracts of wild and uncultivated lands at all times exposed to trespasses and encroachments without the knowledge of the true owners. There

is no decision of this court to countenance the doctrine, and the decided weight of authority elsewhere, as well as sound principle, is opposed to it.

In *Den* v. *Hunt, Spencer* 487, there was during the whole period an actual occupancy of a part of the tract. The possession was not only visible, accompanied by public and notorious acts of ownership over the entire tract, but was actual and uninterrupted.

There is no difference, says Chief Justice Gibson, as regards *occupancy*, between a solitary trespass and repeated acts of trespass. An occupancy to raise the bar of the statute of limitations is indefinitely continuous, while the occupancy of a trespasser, who neither cultivates nor encloses, continues no longer than he remains in contact with the soil. *Wright* v. *Guier*, 9 *Watts* 175.

And in this view there is no distinction between a naked trespasser and one who enters under color of title. Both are alike trespassers. The title papers of the latter may serve to extend and define the limits of his occupancy, but it does not change its character. He is nevertheless a *trespasser*, and the moment his actual occupancy ceases, the rightful owner, without actual entry, is in possession by construction of law.

The mere payment of taxes cannot prove possession. It may be evidence of a claim of title; it may serve to explain the character of the possession, and to extend it beyond the limits of actual occupancy; but the payment of taxes by a party not having the actual possession of any part of the premises cannot prove possession. It would give the owner of the land no right of action against the party paying taxes as a trespasser; and no act can show possession in a party doing it which will not afford to the owner of the land a remedy by action. *Naglee* v. *Albright*, 4 *Wharton* 291.

In *Sorber* v. *Willing*, 10 *Watts* 141, the defendants relied upon the statute of limitations, and, to avail themselves of

Cornelius and Empson v. Giberson.

it, proved that their father had gone upon the land in 1812, and built a saw mill, which continued in operation till 1817, when it went to decay, and finally to ruin ; but, without having had a dwelling on the land, he sold his claim to one of his sons, who, in 1830, built a saw mill on another site, which continued in operation till the commencement of the suit. The ejectment was brought in 1838. Between the years 1817 and 1830, the first occupant and his son, living upon another tract, continued to cut wood from the premises in question every year. The court below was of opinion that nothing less than an actual continued occupation of the land for twenty-one years would give title under the statute of limitations, and that evidence of the defendants having occasionally occupied the land, and always used it as woodland, although they had paid all the taxes, would not entitle them to recover. Upon a writ of error, Chief Justice Gibson, delivering the opinion of the Supreme Court, said : " Of the twenty-six years that elapsed between the first entry and the action, the defendants were out of possession half the period, and the longest period of actual adverse possession consisted but of eight years. Unless, therefore, they can connect their two periods of actual possession by an intermediate adverse link, their defence on the statute must fail. That link is attempted to be supplied by evidence that they or their father had paid the taxes. But does payment of the taxes alone constitute an actual adverse possession ?" After examining the authorities, he concludes—" Payment of taxes alone, therefore, though it may extend the limits of an adverse possession, does not constitute it. Like any other voluntary payment of another's debt, it gives no right or advantage against the owner. There must be along with it an actual occupancy of at least a part of the land ; and for half the period there was no such occupancy in the case before us. If the defendants' claim to the title

had not been abandoned, at least their occupancy had been intermitted."

So in the case before us. Admitting that General Read had the possession of the lands from 1829 to 1832, and again in 1836, while actually engaged in cutting and coaling upon the tract; admitting again, that his heirs, after his death, had the actual occupancy while engaged in carting off the decayed wood from the ninety acre tract cut over by Cornelius, still they were out of the actual occupancy of the land more than half of the period during which the defendant claims that the property was held by adverse possesssion. Nor can an occasional entry upon the land to make surveys, nor the payment of taxes connect the periods of actual adverse possession, so as to constitute one continued, visible, adverse possession for twenty years. These acts show clearly a continued *claim of title*, but they do not prove an *uninterrupted possession*.

The cases of *Ellicott* v. *Pearl* (10 *Peters* 412), and of *Ewing* v. *Burnet* (11 *Peters* 41), are relied upon as militating against this principle; but neither of them, fairly considered, can avail to support the claim of the defendant. In *Ellicott* v. *Pearl*, there was an actual occupancy of part of the tract under color of title, which was held to give constructive possession of the entire tract. *In Ewing* v. *Burnet*, the premises in dispute was a vacant lot in the city of Cincinnati. The charge of the court upon the trial was, that suing for trespass on the lot, paying the taxes, and speaking publicly of his claim, were not sufficient to constitute an adverse possession. That exclusive appropriation by actual occupancy, notice to the public and all concerned of the claim and enjoyment of profits by defendant, were all necessary. And upon writ of error, the Supreme Court lays down the principle thus: "It is well settled, that to constitute an adverse possession there need

Cornelius and Empson v. Giberson.

not be a fence, building, or other improvement made; it suffices for this purpose that visible and notorious acts of ownership are exercised over the premises in controversy for twenty-one years after an entry under claim and color of title. So much depends on the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it, that it is difficult to lay down any precise rule adapted to all cases. But it may with safety be said, that where acts of ownership have been done upon land, which from their nature indicate a notorious claim of property in it, and are continued for twenty-one years, *with the knowledge of an adverse claimant*, without interruption or an adverse entry by him for twenty-one years, such acts are evidence of an ouster of a former owner, and an actual adverse possession against him, if the jury shall think that the property was not susceptible of a more strict or definite possession than had been so taken and held." Admitting the entire soundness of the principle thus stated, it is not perceived that it aids the defendant's case or sustains his claim of title. Giving to the defendant's evidence its utmost latitude, assuming that it was fully credited by the jury, it failed to establish twenty years' adverse possession in the defendant and those under whom he claimed, and the court should so have instructed the jury. Upon this ground, the judgment should be reversed.

This view of the case renders it unnecessary to express any opinion upon another question, fully discussed upon the argument, *viz.* whether the doctrine, that a party who enters *bona fide* under a claim of title, and occupies a part of the tract, shall be deemed in constructive possession of the whole tract described in his deed, applies to all cases, whatever may be the nature of the possession or the extent of the tract; or whether it is strictly limited to cases of actual occupancy and to small tracts or parcels appurtenant to the part thus occupied. The question is not free

from difficulty, and the authorities are in conflict respecting it.   No opinion upon the point is necessary in this case.

The judgment must be reversed, and a *venire de novo* awarded.

CITED *in Cobb v. Davenport*, 3 *Vr.* 385.