## Kaul & Hall Oil and Gas Company v. New Shawmut Mining Company

*Thomas G. Wagner,* for plaintiff.
*Anthony B. Trambley,* for defendant.

GREINER, *P.J.,* February 16, 1981—

## ISSUES

At issue is the fee ownership of 82.95 acres of land in Jay Township, Elk County, Pa. Plaintiff claims ownership by virtue of four treasurer's tax deeds acquired by its predecessors, James K. P. Hall and Andrew Kaul in 1906 and 1908. Defendant bases its ownership of the same land upon a deed from receivers of the Kersey Mining Company, a corporation, dated May 2, 1947. The Kersey Mining Company in turn acquired the property by deed dated August 12, 1902, from the Kersey Mining Company, a partnership. Additionally, defendant claims ownership of the subject premises by adverse possession as well as by abandonment by plaintiff. By way of defense, defendant asserts plaintiff's tax deeds are void due to substantive and procedural defects in the tax sale and the tax deeds themselves.

## OWNERSHIP BY DEED

It has long been established that in ejectment a plaintiff must recover on the strength of his own title and not on the weakness of the defendant's:

Smith v. Miller et al., 289 Pa. 184, 190, 137 Atl.254 (1927); Blumner v. Metropolitan Life Insurance Company, 362 Pa. 7, 66 A.2d 245 (1949). Plaintiff has not met this burden.

Each of plaintiff's 1906 tax deeds and each of plaintiff's 1908 tax deeds describe an unseated tract in Warrant 4895 containing 41½-acres assessed to C. Elmer Coryell. The tax sales were made for the years 1904, 1905 and 1906, 1907 respectively. The relevant assessment records for the years 1904 through 1907 reveal two separate assessments of 98 acres each in Warrant 4895, Jay Township, assessed to C. Elmer Coryell. Plaintiff claims that when added together the two 41½-acre parcels form 83 acres and that the deeds in both chains of title which describe the property by metes and bounds refer to acreage as 82.95. This "bootstrap" reasoning is after the fact and is an erroneous premise as relates to the actual assessments and tax sales on which plaintiff's claim to title is based. Although the four tax deeds were for 41½ acres each in Warrant 4895 assessed to C. Elmer Coryell there were absolutely no assessments for the delinquent tax years of 1904 through 1907 for 41½ acres in Warrant 4895 assessed to C. Elmer Coryell. A valid assessment is a necessary prerequisite to a tax sale which must be complied with otherwise the sale is void: Nypen Corporation v. Sechrist, 138 Pa. Super. 361, 10 A.2d 822 (1940); Bratton v. Mitchell, 7 Watts & Sergeant 259 (1844); McClements v. Downey, 2 Pa. Super. 443 (1896). It is the duty of taxing officers to assess the entire adjacent real estate holdings of the owner, not severed or detached by his own act, as a single body, and they have no authority to divide them and assess them separately for the purpose of taxation: Nypen, supra.; McCormick et al., Trustees v. Berkay et al.,

238 Pa. 264, 280, 86 A. 97 (1913). Even accepting, arguendo, plaintiff's position that by the series of deed transactions involving its chain of title and defendant's chain of title, the two tracts of 41½ acres could be traced back to or identified with the 82.95 acres described in metes and bounds in each chain of title, it does not cure the fatal defect of plaintiff's tax titles being founded on invalid assessments. The treasurer was legally obligated to sell the parcels as they were assessed and had no authority to split up assessments into two separate deeds, just as a tax deed cannot embrace several properties that were separately assessed: Carrattelli v. Castrodale, 185 Pa. Super 426, 137 A.2d 805 (1958). The tax deeds should describe the land sold, following the description in the assessment: McReynolds v. Longenberger, 75 Pa. 13 (1874). It is the well settled rule of this Commonwealth that no tax sale of land is valid unless both the assessment and the conveyance by the treasurer contain sufficient descriptions to identify and disclose the property taxed and sold. It is not necessary that the description by metes and bounds but the land must be so identified that the owner, the collector and the public can determine what property is being assessed or sold: Carrattelli, supra.; Sarous, appellant v. Morgan, 171 Pa. Super. 165, 90 A.2d 353 (1952).

It is also noted that C. Elmer Coryell, the assessed owner for which the delinquent taxes were sold, was not the true owner at the time of the assessments and sales. Thomas E. Proctor by deed dated July 13, 1901, and recorded in Deed Book 93 at Page 378 conveyed 82.95 acres in Jay Township to Andrew Kaul and J.K.P. Hall, who in turn conveyed the same to Kersey Mining Company, a partnership, by deed dated July 24, 1902, recorded in Deed Book 55, Page 1. Kersey Mining Company, a partnership,

by deed dated August 12, 1902, conveyed the same premises to Kersey Mining Company, a corporation, the record owner at the time of the assessment years 1904 through 1907 and tax sales of 1906 and 1908. Whether an assessment identifying a property by name other than that of the true owner is sufficient must necessarily depend on numerous facts and circumstances. Important factors in such determination are the nature of the land conveyed, whether rural or urban, and whether there are other lands in the immediate vicinity owned by the same person: Humphrey v. Clark, 359 Pa. 250, 255, 58 A.2d 836 (1948); Sarous, supra. For the years in question Coryell was assessed with two 98-acre tracts in Warrant 4895, Jay Township, with no distinguishing description as to the location of the two 41½-acre tracts with relation thereto.

The court has given consideration to Banard v. New York State Natural Gas Corporation, 448 Pa. 239, 293 A.2d 41 (1972), and recognizes that a tax sale of unseated land need not be in the name of the record owner. However, for the reasons stated above, the assessments on which plaintiff's tax titles are based were completely invalid.

Plaintiff claims the presumption of the law is the sale of the land was in pursuance of a regular assessment, Glass v. Seger, 265 Pa. 391, 109 Atl. 211 (1920), and that the acts of public officials are always entitled to a presumption of regularity, Clark v. Weinberg, 38 Pa. Commw. 300, 393 A.2d 507 (1978), and that defendant bears the burden of overcoming this presumption. Under the facts of the instant case, both presumptions are inapposite. Their application is to administrative regularity and not to the fundamental necessity of a valid assessment by way of proper identification of subject premises. Arguendo, defendant has met the burden

of overcoming these presumptions.

Defendant, New Shawmut Mining Company, is the true owner of subject premises by deed from Thomas C. Buchanan and Robert A. Sproul, Jr., Receivers of the Kersey Mining Company by deed dated May 2, 1947, recorded in Elk County Deed Book 109, Page 1.

## TAX SALES VOID DUE TO RECEIVERSHIP

On August 1, 1905, the land at issue was subject to a mortgage given by the Kersey Mining Company to the Central Bank and Trust Company of New York dated February 1, 1902, and recorded August 1, 1902, in Elk County Mortgage Book 0, Page 107, being Item No. 33 on Page 22 of said mortgage. On the same date, August 1, 1905, Frank Sullivan Smith was appointed by the United States Circuit Court for the Western District of Pennsylvania as the first receiver for all the real and personal property of the Pittsburgh, Shawmut and Northern Railroad Company, Shawmut Mining Company, and the Kersey Mining Company, which real property included subject premises as set forth in Item 33 on Page 122 of said mortgage.

Although it is settled that property in a receivership is liable for taxes, however, the fact that the receivership is liable for the taxes does not determine in what way payment may be enforced if the taxes are not paid when due. Defendant's predecessor, Kersey Mining Company, was in Federal receivership from August 1, 1905, until 1947 when the receivership was concluded and liquidated. The order of August 1, 1905, appointing the receiver directs him to pay all taxes, but the same order provided that as "the officer of this court he (the receiver) continue to operate the said mortgaged property

... in such manner as may be directed by the court." The order also says that "said receiver is hereby fully authorized to operate the mortgaged property and premises as will in his opinion produce the best financial result and for that purpose he is vested with full discretionary power subject to the approval of the court. . ." A lengthy and detailed review of the cases of many jurisdictions involving the issue between federal receivers and local taxing authorities is set forth in 3 ALR 2d 895. The leading case supporting the position that leave of the federal court is required before property such as subject premises can be levied upon and sold by local taxing authorities for delinquent taxes is Re Tyler, 149 U.S. 164, 37 L.Ed. 689, 13 S.Ct. 785, more recently adopted in Delaware v. Irving Trust Co., 92 F.2d 17, certiorari denied, 302 U.S. 754, 82 L.Ed. 583, 58 S.Ct. 283. Plaintiff urges us to adopt the suggested disposition to the contrary under Johnson v. Smith, 3 ALR 2d 888. We are compelled to adopt the reasoning and overwhelming number of authorities supporting the holding of Tyler, supra, that leave of the federal court is necessary to enable a local taxing body to distrain land for taxes. "It is the duty of the court to see to it that this (payment of taxes) is done; and a seizure of property against its will can only be predicated upon the assumption that the court will fail in the discharge of its duty, an assumption carrying a contempt upon its face." Tyler, supra. It is also reasoned that claims for taxes like all other claims in a receivership should be filed and proved as this enables the receiver, who may initially be unfamiliar with the day-to-day operations of a large company, to fairly pay claims as they come due with the assets available. Also that when property is in custody of a court of equity it will take the entire estate of the insolvent into its hands, marshal

the assets, determine the claims and their priority and distribute. the fund to the creditors and others whose rights have been established. McRae v. Bowers Dredging Co., 90 F 360, (1898 C.C. Wash.)

The rule that court approval is necessary for a tax sale is the better rule and one which makes possible the fairest and most complete handling of an equity receivership. This rule has been upheld with regularity in federal equity receiverships. Northern Finance Corp. v. Byrnes (1925) 5 F2d 11; Virginia T&C Steel and Iron Co. v. Bristol Land Co. (1898), 88 F 134; Lee v. Freeman (1935), 79 F2d 868. These same courts have held that where, as here, there is a tax sale during a receivership without court approval such a sale is absolutely void and of no effect.

We hold that the tax sales upon which plaintiffs claim title were absolutely void and of no effect by reason of subject premises being in federal receivership.

## ADVERSE POSSESSION

Although by reason of the foregoing it would be unnecessary for the court to give consideration to defendant's claim to title by adverse possession, the parties, their counsel and the court having expended considerable time in presenting and receiving testimony and viewing the premises as relates to the issue of adverse possession, the court deems it appropriate to address same.

There can be no question that defendant and its predecessors in title always claimed ownership to said premises and conducted any desired activities in and on said premises consistent with its claim to exclusive ownership. The only question is whether or not defendant exercised its claim to ownership in such a manner as to vest legal title in it by adverse

possession. Possession, to be adverse, must be actual, continuous, exclusive, visible, notorious, distinct and hostile for the prescriptive period of 21 years: Parks et al., Appellants v. Pennsylvania Railroad Company, 301 Pa. 475, 152 Atl. 682 (1930); Hawk v. Senseman, 6 S. & R. 21; Wright v. Guier, 9 Watts 172-5; Pierce v. Barney, 209 Pa. 132, 135, 58 Atl. 152 (1904). A sporadic use of land, by one without title to it, will not operate to give him a title, no matter how often repeated: Parks, supra; Wright, supra. Defendant's Exhibit no. 2, a large linen tracing or map (65 inches x 40 inches) showing in minute detail every heading, passageway and mine room of defendant's predecessor's deep mine operations described on the map as Shawmut Mining Company, The Byrnedale Field, including subject premises designated by defendant and its predecessors as the Emma H. Proctor tract in fee and the mining operation conducted in and on said premises as no. 41 mine. Although this detailed mine map was not recorded it is and was part of the business records of defendant and its predecessors. Defendant's president and its long-time surveyor-engineer testified as to the exclusive possession and control of the map in defendant, having received same with all of the other records of the receivers at time of conveyance to defendant May 2, 1947. On this same map is a schedule of mine workings for each of the mining operations represented and the dates to which such operations where progressively extended. The extension dates on no. 41 mine, the parcel in controversy being part of same, commenced March 1901 and continued at various intervals through November 14, 1922, there being 19 separate date entries. To give an idea of the extent and vastness of these mining operations conducted by defendant and its predecessors in "The Byrnedale Field," the oper-

ations depicted on a scale of 400 feet equals one inch, covers the entire surface of the map. Defendant's witnesses, as clearly supported by view of the premises, confirmed the existence of a railroad serving the mining in and on subject premises as well as the surrounding areas and tram roads over which coal cars left the deep mine operations and traversed the surface of the lower part of said parcel to large tipples into which the coal was dumped and processed for loading on the railroad cars. In addition to deep mine openings with supporting surface tram roads, et cetera, on said premises, the testimony revealed that the surface of said premises was also used for supporting and implementing the extensive mining operations on adjacent lands. Testimony, supported by the map, also revealed that defendant's predecessors had leased to Weed and Burch an area near their own main headings, for deep mine operations and that such area had been "worked out." The lessee, Burch, was the father of the surveyor-engineer employee of defendant and its predecessors, and his personal recollection confirmed the surface activities incident to the deep mining operations of his father and defendant and its predecessors. A written "Agreement in Extension of Lease" from the receivers to M. D. Weed and L. H. Burch, dated November 10, 1919, extending a lease for lessee's deep mining operations on subject premises from September 14, 1917, to the April 1, 1920, was also received into evidence. The extent of the mining operations in and on said premises conclusively proves that defendant's predecessors exercised their claim to legal title in fee by actual, continuous, exclusive, visible, notorious, distinct and hostile possession for the period in excess of 21 years, eight months, as the first mined workings extension date of March 1901 could only occur after

mining operations prior to that date.

Plaintiff's attention was directed to this parcel in the spring of 1980 after having observed that a roadway had been bulldozed diagonally across the northwestern part by a current lessee of defendant conducting strip mining operations on adjoining land. He testified that he merely followed the path of an existing old roadway which led from an improved public highway to the former mining village of Cardiff just to the west of subject tract. A number of local residents, all of an age to remember the periods well before World War I and extending through the '30s and to the present time, described this road as "The Beer Road" because it was a shortcut for horse-drawn wagons to haul beer and other supplies into the village of Cardiff and that it was used continuously, not only by defendant's predecessors, but also by anyone else who desired.

Although defendant leased a portion of said coal and surface to one Berlanti in 1947 for strip mining operations which were conducted by him, and gave a right-of-way across the entire property to the Jay Township Supervisors for a water line leading from the water reservoir to the town of Force, which required open ditch digging to a depth of at least four feet, but is now obscured by the natural growth of brush, et cetera, plaintiff points out that these isolated incidents of open and notorious possession by defendant were not continuous. Defendant's testimony of laying out and mapping a proposed strip mining operation in 1966, supported by its Exhibit No. 3, would indicate open and notorious activity on the surface of part of said land but it is admitted that no strip mining operation resulted therefrom. Plaintiff also contends that adverse possession in favor of defendant and/or its predecessors in title could not

run against plaintiff until after it or its predecessors in title acquired their claim to title by the tax deeds of 1906 and 1908. We disagree. Adverse possession if established is against the whole world.

It was also uncontradicted that defendant granted the road supervisors in the area the right to carry away "red dog," that developed through the combustion of culm piles near the old deep mine workings, for the purpose of surfacing township roads. Although said surface activity exercised by defendant was limited to the lower portion of the property, it was uncontradicted that it had been a continuous operation from 1947 to the present time.

Plaintiff contends that to the extent defendant did openly and notoriously exercise possession over part of said property, neither it nor its predecessors had fenced the boundaries or otherwise improved the surface or conducted activities on the entire 82.95 acres, and in support thereof relies upon Stark v. Pennsylvania Coal Company, 241 Pa. 597 (1913). The following quotation therefrom easily distinguishes its holding on the facts:

"It is perhaps a close question whether the acts of the defendant in depositing the culm on the surface of the land and the laying of the railroad track across it, do not bring the case within the definition of possession stated above. But as the referee has made a finding of fact in favor of the plaintiffs upon this point, we do not feel inclined to disturb it, the more so because the mining of the coal which is the basis of the present suit was unknown to plaintiffs at the time it occurred and for years afterwards. There was nothing upon the surface to indicate that such work was going on, and the mining will not in itself constitute possession. It was not visible nor was it notorious."

The instant case presents just the opposite factual situation in that not only was there open and notorious surface activity but the fact that the common predecessor in title, J.K.P. Hall et ux and Andrew Kaul et ux conveyed subject premises to Kersey Mining Company, a partnership, by deed dated July 24, 1902, recorded in Elk County Deed Book 55 at Page 1, which would indicate full knowledge of mining operations and all necessary surface activities incident thereto including, but not being limited to, the various mine mouth or main heading openings, air shafts, tool sheds, mule barns, tram roads, etc. Plaintiff also relies upon Delaware and Hudson Canal Company v. Hughes, 183 Pa. 66 (1897), for the premise that adverse possession of the mineral estate conveys no rights with regard to the surface estate. Again we are compelled to distinguish the factual difference because in that case the coal had been separately conveyed. Also the defendant herein is claiming adverse possession by reason of the continuous and notorious activities on the surface and not merely because it and/or its predecessors had deep mined the coal underlying the surface. We think it important that defendant's predecessors had no less than color of title by deed description by metes and bounds accurately describing the entire 82.95 acre tract, at such time as the continuous and notorious possession was being exercised. On the other hand plaintiff's 1906 and 1908 tax-title source deeds do not give a description of premises which would enable one to locate it. As stated in Volume 1 P.L.E. §62:

"To give effect to the statute of limitations, the possession of an occupant by color of title, is co-extensive with his title; but the possession of an avowed intruder is confined to the land actually oc-

cupied by him." McCall v. Neely, 3 Watt's 69, 70 (1834).

Thus it was not necessary for defendant nor its predecessors to set up a fence around its property since the possession of the property is the same as the metes and bounds established in defendant's and/or its predecessors' deeds which gives them color of title.

We thus conclude that the defendant through its predecessors in title established good legal title in fee by adverse possession and that its predecessors in title had such good legal title in fee at the time it conveyed said premises to defendant by deed dated May 2, 1947.

We therefore make the following

## ORDER OF COURT

Now, February 16, 1981, it is ordered and decreed that the preliminary injunction issued June 20, 1980, and the stipulation entered pursuant thereto and approved by the court June 25, 1980, are dismissed as is plaintiff's complaint upon which same were founded, plaintiff's prayer for granting judgment to it for ejectment of defendant from said premises is denied and defendant is declared to have full and complete legal title in fee to said premises.